UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------

| | |
|---|---|
| JOSEPH ZAPPIA, Individually and on Behalf of All Others Similarly Situated,<br><br>            Plaintiff,<br><br>     v.<br><br>MYOVANT SCIENCES LTD., MYOVANT SCIENCES, INC., SUMITOMO PHARMA AMERICA, INC., TERRIE CURRAN, MARK GUINAN, DAVID MAREK, NANCY VALENTE, and MATTHEW LANG.<br><br>            Defendants. | Case No. 23-cv-08097-JSR<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Joseph Zappia ("Plaintiff") individually and on behalf of all others similarly-situated, by the undersigned attorneys, alleges as follows based (i) upon personal knowledge with respect to Plaintiff's own acts, and (ii) upon information and belief as to all other matters based on the investigation conducted by Plaintiff's attorneys, which included, among other things, a review of relevant U.S. Securities and Exchange Commission ("SEC") filings, and other publicly available information. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## NATURE OF THE ACTION

1.     This class action is brought by Plaintiff individually and on behalf of the Class (as defined below) against Sumitomo Pharma America, Inc. ("Sumitomo Pharma America"); Myovant Sciences, Ltd. ("Myovant"); Myovant Sciences, Inc. ("Myovant U.S."), a wholly-owned

---

[1] All emphasis in any quoted language below is added, unless otherwise noted.

subsidiary of Myovant; and former members of Myovant's board of directors ("Board"), for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a) and § 78t(a), and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9(a) ("Rule 14a-9").

2.    Myovant is a biopharmaceutical company that has developed and commercialized (i) ORGOVYX, a drug to treat prostate cancer in men, and (ii) MYFEMBREE, a drug used to treat uterine fibroids and endometriosis in women.

3.    On October 23, 2022, Myovant, Myovant U.S., Sumitovant Biopharma Ltd. ("Sumitovant"), and Sumitovant's parent, Sumitomo Pharma Co., Ltd. ("Sumitomo Pharma"), jointly announced that Sumitovant had agreed to acquire all of the outstanding common shares of Myovant that Sumitovant did not already own for $27.00 per share in cash via a merger transaction ("Merger").

4.    As of October 23, 2022, Sumitovant already owned approximately 52% of the outstanding common shares of Myovant, and was itself a wholly owned subsidiary of Sumitomo Pharma, a pharmaceutical company located in and organized under the laws of Japan. In turn, as of October 3, 2022, 51.76% of Sumitomo Pharma was owned by Sumitomo Chemical Co., Ltd. ("Sumitomo Chemical"), a Japanese manufacturer of chemicals, plastics, pharmaceuticals and other products that is publicly traded on the Tokyo Stock Exchange. As a result of Sumitomo Chemical's 51.76% ownership interest in Sumitomo Pharma, Sumitomo Chemical (along with Sumitomo Pharma) appeared as a Reporting Person on the Schedule 13D/A, dated October 23, 2022, disclosing Sumitovant's approximately 52% ownership interest in Myovant.

5.    Sumitomo Pharma and Sumitomo Chemical are both members of the Sumitomo

Group of Companies ("Sumitomo Group").[2] The Sumitomo Group is one of the leading *keiretsu* in Japan. *Keiretsu* are networks of Japanese businesses connected by cross-shareholdings and informal business relations, which typically feature a member bank that lends funds to other companies in the *keiretsu*.[3] Companies in the Sumitomo Group *keiretsu* act in concert through the Sumitomo Group Public Affairs Committee, which engages in public relations initiatives to enhance public trust in the members of the Sumitomo Group (including publishing a quarterly newsletter to which senior executives of Sumitomo Group members contribute).[4]

6.      On January 23, 2023, Defendants authorized the filing of a false and misleading definitive proxy statement ("Proxy") concerning the Merger with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. The Proxy solicited public Myovant shareholders holding a minority of Myovant's common shares ("Minority Myovant Shareholders") to vote in favor of the Merger ("Stockholder Vote") at a special meeting of Myovant shareholders later held on March 1, 2023. As the Proxy explained, the Board is "furnishing this proxy statement and form of proxy card to the holders of Myovant common shares in connection with the solicitation of proxies in favor of the Merger Proposal."

7.      The Proxy further advised Minority Myovant Shareholders that "***[y]our vote is very important, regardless of the number of Myovant common shares you own***," and that "***[t]he Merger cannot be completed unless . . . approved by the affirmative vote of the holders of*** (i) a

---

[2] *See* https://www.sumitomo.gr.jp/english/org/company/ (last visited on: October 17, 2023).

[3] *See generally* Artur F. Tomeczek, *The evolution of Japanese keiretsu networks: A review and text network analysis of their perceptions in economics*, Japan and the World Economy, Vol. 62 (2022).

[4] *See* https://www.sumitomo.gr.jp/english/committee/message/ and https://www.sumitomo.gr.jp/english/committee/public-relations/quarterly/ (last visited on: October 17, 2023).

majority of the issued and outstanding Myovant common shares entitled to vote on the Merger . .

. *and (ii) a majority of the outstanding Myovant common shares held by Myovant's shareholders other than Sumitovant or its affiliates* [i.e., a majority of Minority Myovant Shareholders]." Thus, the Merger was expressly conditioned on approval of a majority of the Minority Myovant Shareholders.

8.      Additionally—consistent with the practice of a member bank lending money to other member companies in a *keiretsu*—the Proxy advised that Sumitomo Pharma had secured debt financing to consummate the Merger from another member of the Sumitomo Group, Sumitomo Mitsui Banking Corporation ("Sumitomo Banking"), in the form of a senior unsecured term loan facility in an aggregate amount of Japanese Yen equivalent to $1.7 billion (the total sum necessary to pay $27.00 per share in cash to all Minority Myovant Shareholders and holders of various equity-based awards, repay certain indebtedness of Myovant, and pay the costs and expenses related to the Merger). Also consistent with the *keiretsu* practice of cross shareholdings, as of September 30, 2022, Sumitomo Banking owned 1.4% of Sumitomo Pharma's parent, Sumitomo Chemical.[5]

9.      The Proxy contained material misrepresentations and omissions that misled Minority Myovant Shareholders into voting to approve the Merger on March 1, 2023, at a price that was less than Myovant's full and fair value. Specifically, the Proxy stated that the special committee ("Special Committee") formed by the Board to negotiate the Merger had retained Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") on June 28, 2022, as its legal advisor "based on, among other things, Skadden's qualifications, experience and reputation and *the*

---

[5] *See* https://www.sumitomo-chem.co.jp/english/ir/stocks/information/ (last visited on: October 17, 2023).

*absence of conflicts on the part of Skadden*."

10.     The statement in the Proxy that Skadden did not have any conflicts was false because, in fact, Skadden had multiple conflicts when it was retained by the Special Committee—none of which were disclosed in the Proxy to Minority Myovant Shareholders (collectively, the "Skadden Conflicts"). *First*, when the Special Committee retained Skadden based on a purported "absence of conflicts," Skadden was *concurrently* representing Sumitomo Banking (which financed the Merger), as well as another member of the Sumitomo Group, SMBC Nikko Securities Inc. ("Sumitomo Nikko") and other affiliated entities, in connection with a strategic alliance with Jefferies Financial Group, Inc. ("Jefferies"). Pursuant to that strategic alliance, Sumitomo Banking increased its ownership stake in Jefferies to up to 15% (representing a financial commitment to Jefferies of $3.4 billion).

11.     Skadden represented Sumitomo Banking, Sumitomo Nikko and other affiliated entities in connection with their initial entry into the strategic alliance with Jefferies, which was announced on July 14, 2021—**less than a year before the Special Committee retained Skadden**.[6] Subsequently, an expansion of the strategic alliance with Jefferies was announced on April 27, 2023—**less than two months after the closing of the Merger**.[7] Thus, Skadden was continuously representing two members of the Sumitomo Group—Sumitomo Banking and Sumitomo Nikko—as well as their affiliates in connection with a strategic alliance with Jefferies while *simultaneously* representing the Special Committee in negotiations *against* two other members of the Sumitomo

---

[6] *See* https://ir.jefferies.com/press-releases/press-release-details/2021/Jefferies-and-SMBC-Group-Announce-Strategic-Alliance-to-Drive-Growth/default.aspx (last visited on: October 17, 2023).

[7] *See* https://ir.jefferies.com/press-releases/press-release-details/2023/Jefferies-and-SMBC-Expand-and-Strengthen-Strategic-Alliance-Broadening-Joint-Business-Efforts-and-Increasing-SMBCs-Equity-Ownership-in-Jefferies/default.aspx (last visited on: October 17, 2023).

Group—Sumitomo Chemical and Sumitomo Pharma—in connection with the acquisition of Myovant *financed by Sumitomo Banking*.

12.      *Second*, when the Special Committee retained Skadden based on a purported "absence of conflicts," Skadden was *concurrently* representing Sumitomo Banking in a strategic collaboration with Marathon Capital LLC ("Marathon Capital") that was announced on June 28, 2022—***the same day that the Special Committee retained Skadden***.[8]

13.      *Third*, when the Special Committee retained Skadden based on a purported "absence of conflicts," Skadden was *concurrently* representing another member of the Sumitomo Group, Sumitomo Mitsui Trust Bank, Limited ("Sumitomo Trust"), and Sumitomo Trust's parent (Sumitomo Mitsui Trust Holdings, Inc.), in connection with a strategic partnership with Apollo Global Management, Inc. ("Apollo") that was announced on July 6, 2022—***just over one week after the Special Committee retained Skadden***.[9] Pursuant to that strategic partnership, Sumitomo Trust committed to invest $1.5 billion alongside Apollo in a portfolio of alternative assets. As of September 30, 2022, Sumitomo Trust owned 1.77% of Sumitomo Chemical together with Sumitomo Life Insurance Company ("Sumitomo Life") via the Custody Bank of Japan, Ltd.[10]

14.      *Fourth*, when the Special Committee retained Skadden based on a purported "absence of conflicts," Skadden was *concurrently* representing Sumitomo Group member Sumitomo Nikko in connection with its role as international joint lead manager of the $459 million initial public offering ("IPO") of Socionext Inc. ("Socionext") on the Tokyo Stock Exchange

---

[8] *See* https://www.marathoncapital.com/news/marathon-capital-and-sumitomo-mitsui-banking-corporation-form-strategic-partnership (last visited on: October 17, 2023).

[9] *See* https://www.apollo.com/media/press-releases/2022/07-06-2022 (last visited on: October 17, 2023).

[10] *See* https://www.sumitomo-chem.co.jp/english/ir/stocks/information/ (last visited on: October 17, 2023).

consummated on October 12, 2022—*by which time Skadden was deeply involved in the negotiation of the Merger as legal advisor to the Special Committee*.[11]

15.    In sum, after being retained to advise the Special Committee in negotiations *against* Sumitovant and Sumitomo Pharma (owned 52% by Sumitomo Chemical) based on a purported "absence of conflicts," Skadden was—unbeknownst to Minority Myovant Shareholders—*simultaneously* representing other members of the Sumitomo Group *keiretsu* in connection with substantial legal matters, including *simultaneously* representing the bank financing the Merger, Sumitomo Banking, in two different substantial legal matters (i.e., the Marathon and Jefferies alliances).[12]

16.    The experience and expertise of a law firm like Skadden advising a special committee puts the law firm in a position to strongly influence the choices and decision making of the committee's members. Therefore, a law firm like Skadden advising a special committee must be free of conflicts that may provide the law firm with an incentive to provide biased advice to the committee. Here, Sumitomo Banking is earning profits from financing the Merger, while

---

[11]  *See* https://www.skadden.com/about/news-and-rankings/news/2022/10/socionext-completes-ipo-on-tokyo-stock-exchange  (last visited: October 17, 2023).

[12]  Additionally, on May 18, 2021—*just over a year before the Special Committee retained Skadden*—Skadden announced that it had advised the underwriters on the offering of $920 million in step-up callable subordinated notes due 2081 by another member of the Sumitomo Group, Sumitomo Life Insurance Company ("Sumitomo Life").    *See* https://www.skadden.com/about/news-and-rankings/news/2020/05/sumitomo-life-insurance-completes-bond-offering (last visited on: October 17, 2023). As of September 30, 2022, Sumitomo Life owned 4.34% of Sumitomo Chemical.    *See*  https://www.sumitomo-chem.co.jp/english/ir/stocks/information/ (last visited on: October 17, 2023). Finally, a little over two years before being retained by the Special Committee, Skadden represented Sumitomo Banking in connection with a strategic partnership with Ares Management Corporation ("Ares") announced          on          March          30,          2020.          *See* https://www.businesswire.com/news/home/20200330005176/en/Ares-Management-Corporation-and-Sumitomo-Mitsui-Banking-Corporation-Announce-Strategic-Agreement-and-Equity-Transaction (last visited on: October 17, 2023)

Sumitomo Pharma now owns 100% of Myovant. Sumitomo Banking and Sumitomo Pharma would have lost those opportunities had the Special Committee rejected Sumitovant's "best and final" offer of $27.00, and instead elected to either remain independent or transact with a competing bidder. Thus, given its ongoing relationships with Sumitomo Banking and other members of the Sumitomo Group, Skadden had an incentive to discourage the Special Committee from soliciting competing bids that could derail the Merger, and to skew its advice to the Special Committee towards consummating the Merger with Sumitovant even at a suboptimal price.

17.    In particular, according to the Proxy—despite harboring an incentive to discourage the solicitation of competing bids because of its relationships with Sumitomo Banking and other Sumitomo Group members—Skadden participated in discussions concerning whether the Special Committee should reach out to other potential counterparties. The Special Committee was expressly empowered to consider alternative transactions, and thus could have reached out to other potential counterparties that might be interested in acquiring Myovant. Even though Sumitovant and Sumitomo Pharma advised that they would not support an alternative transaction, the Special Committee could have tested that assertion by soliciting competing bids. At a minimum, competing bids would have increased the Special Committee's negotiating leverage with Sumitovant, and put pressure on Sumitovant to raise its own bid (which it almost certainly would have since, as discussed below, $27.00 per share did not represent the highest value that its financial advisor, J.P. Morgan, had assigned to Myovant).

18.    Instead, after discussions in which a conflicted Skadden participated, the Special Committee unjustifiably concluded that there was no point in reaching out to other potential counterparties, and it therefore failed to solicit any competing bids. Even when another potential acquiror—identified in the Proxy as Company A—proactively reached out to the Special

Committee's financial advisor, Goldman Sachs & Co. LLC ("Goldman") to indicate that it was potentially interested in acquiring Myovant, the Special Committee did not treat Company A's overture seriously, including not proposing that Company A execute a non-disclosure agreement with Myovant (which would have given Company A access to confidential non-public information that it could have used to formulate a competing bid). In sum, after discussions in which a conflicted Skadden participated, the Special Committee adopted what courts have critically described as a "controlled mindset" pursuant to which the Special Committee viewed a deal with its controlling shareholder, Sumitovant—or saying "no" to Sumitovant and remaining independent—as the only two options on the table, and disregarded the third option of a deal with another counterparty. This controlled mindset sharply diminished the Special Committee's negotiating leverage with Sumitovant since Sumitovant knew there were no competing bids.

19.    The Special Committee's decision not to solicit competing bids after discussions in which a conflicted Skadden participated resulted in a sale of Myovant to Sumitovant at an unfair price. According to the Proxy, the $27.00 per share to which the Special Committee agreed was lower than the up to $29.50 per share that Sumitovant would have been willing to pay for Myovant based on the discounted cash flow ("DCF") analysis prepared by Sumitovant's financial advisor, J.P. Morgan Securities LLC ("J.P. Morgan") (which assigned a value range of $22.50 to $29.50 per share to Myovant). Had the Special Committee solicited competing bids, Sumitovant would have felt pressure to raise its own bid, and would have almost certainly come up to at least $29.50 given J.P. Morgan's DCF analysis.

20.    Based on the foregoing, the statement in the Proxy that Skadden had no conflicts was a material misrepresentation, and nondisclosure of the Skadden Conflicts was a material omission, since disclosure of the Skadden Conflicts would have significantly altered the total mix

of information made available to Minority Myovant Shareholders. In particular, given Skadden's participation in meetings with the Special Committee to discuss the solicitation of competing bids, Minority Myovant Shareholders plainly would have wanted to know that Skadden had an incentive to discourage solicitation of competing bids because it was *concurrently* representing the bank financing the Merger (Sumitomo Banking), as well as fellow members of Sumitomo Pharma and Sumitomo Chemical in the Sumitomo Group, in various other matters. Indeed, aside from highlighting Skadden's purported "absence of conflicts," the Proxy relates that, before retaining other advisors, the Special Committee first determined that such other advisors "were not disqualified from being engaged by the Special Committee by virtue of any ***potential conflicts of interest*** with respect to a potential transaction with Sumitovant and [Sumitomo Pharma]." The Proxy thus concedes that potential conflicts affecting any financial or legal advisors of the Special Committee were a material consideration for Minority Myovant Shareholders.

21.    Accordingly, on behalf of Minority Myovant Shareholders, this action seeks to recover damages from Defendants arising from the false statement in the Proxy that Skadden had no conflicts, which concealed the Skadden Conflicts from Minority Myovant Shareholders when they voted on the Merger on March 1, 2023.[13]

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

23.    This Court has personal jurisdiction over each of the Defendants because each

---

[13] As discussed below, the undisclosed Skadden Conflicts also rendered false and misleading the statement in the Proxy that Skadden was "independent." *See infra*.

defendant has sufficient minimum contacts with the United States to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. *See Moon Joo Yu v. Premiere Power LLC*, No. 14 CIV. 7588 KPF, 2015 WL 4629495, at *5 (S.D.N.Y. Aug. 4, 2015) (because Exchange Act provides for nationwide service of process, and Defendant . . . conducts business within the United States, he should reasonably anticipate being hauled into court in the United States, and Court's exercise of personal jurisdiction over Defendant with respect to Plaintiffs' securities fraud claim is proper); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 6243526, at *23 (S.D.N.Y. Oct. 20, 2015) ("[w]hen the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process . . . Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state.").

24.    Venue is proper in this District under 15 U.S.C. § 78aa(a) because an act or transaction constituting the violations alleged herein occurred in this District. Specifically, Myovant's stock traded under the ticker "MYOV" on the New York Stock Exchange ("NYSE"), which is headquartered in this District. *See Avalon Holdings Corp. v. Gentile*, 2019 WL 4640206, at *4 (S.D.N.Y. Sept. 24, 2019) (venue proper for Exchange Act claim in Southern District of New York under 15 U.S.C. § 78aa(a) because stock traded on the NYSE) (citing *United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003)). Further, the Proxy advises that, upon consummation of the Merger, Myovant became a wholly-owned subsidiary of Sumitovant, and Sumitovant has a principal place of business address at 151 W. 42nd Street, 15th Floor, New York, NY 10036. Several of the key individuals on the Sumitovant side involved in negotiating the Merger list Sumitovant's New York City address as their business address. Finally, the worldwide

headquarters for Skadden is located in New York City.

## PARTIES

25.     As per the PSLRA Certification previously filed (Dkt. No. 3), Plaintiff was a continuous stockholder of Myovant common stock at all relevant times.

26.     Defendant Myovant is a Bermuda corporation with its principal executive offices located at 7th Floor, 50 Broadway, London, SW1H 0DB, United Kingdom. As a result of the Merger, Myovant became a wholly-owned subsidiary of Sumitovant, which has a principal office address at 151 W. 42nd Street, 15th Floor, New York, NY 10036.

27.     Defendant Myovant U.S. is a Delaware corporation wholly owned by Myovant with offices at 2000 Sierra Point Parkway, Brisbane, CA 94005. According to the Proxy, all of Myovant's executives (including David Marek) were not employees of Myovant, but instead were employees of Myovant U.S., and provided services to Myovant pursuant to an intercompany services agreement.

28.     Defendant Sumitomo Pharma America, Inc. ("Sumitomo Pharma America") is a Delaware corporation with a principal place of business at 55 Cambridge Parkway Suite 102W Cambridge, MA 02142. On April 3, 2023, Sumitovant announced that, effective July 1, 2023, Sumitomo Pharma would combine Sumitovant and its wholly owned U.S. subsidiaries—including Myovant—to form Sumitomo Pharma America ("Consolidation"). On July 10, 2023, Sumitomo Pharma America announced that the Consolidation had been effectuated. The "About Us" page of Sumitomo Pharma America's website references the Sumitomo Group *keiretsu*, explaining that "[o]ur parent company, Sumitomo Pharma Co., Ltd. . . . is a member of the Sumitomo Group,

which has a history of about 400 years."[14]

29.     Defendant Terrie Curran ("Curran") served as a member of the Board and as a member of the Special Committee at all relevant times.

30.     Defendant Mark Guinan ("Guinan") served as a member of the Board and as Chairman of the Special Committee at all relevant times. Guinan signed the Proxy in his capacity as Chairman of the Special Committee.

31.     Defendant Nancy Valente ("Valente") served as a member of the Board and as a member of the Special Committee at all relevant times.

32.     Defendant David Marek ("Marek") served as Chief Executive Officer ("CEO") of Myovant, and as a member of the Board at all relevant times. Marek signed the Proxy in his capacity as CEO of Myovant.

33.     Defendant Matthew Lang ("Lang") served as the General Counsel of Myovant at all relevant times. Lang signed the Proxy in his capacity as General Counsel and Secretary of Myovant.

34.     Defendants identified in paragraphs 29 to 33 are collectively referred to herein as the "Individual Defendants," and together with Myovant and Myovant U.S., collectively, the "Defendants."

**RELEVANT NON-PARTIES**

35.     Sumitovant is a pharmaceutical company organized under the laws of Bermuda with a principal office address at 151 W. 42nd Street, 15th Floor, New York, NY 10036. As of October 23, 2022, Sumitovant beneficially owned approximately 52% of the outstanding common

---

[14] *See* https://www.us.sumitomo-pharma.com/about-us/index.html (last visited on: August 20, 2023)

shares of Myovant, and was itself a wholly owned subsidiary of Sumitomo Pharma. As a result of the Merger, Sumitovant acquired 100% of Myovant. Pursuant to the Consolidation, Sumitovant was combined with other wholly owned subsidiaries of Sumitomo Pharma (including Myovant) to form Sumitomo Pharma America.

36.   Sumitovant's operating entity is Sumitovant Biopharma, Inc. ("SBI"), a Delaware corporation and a wholly owned subsidiary of Sumitovant. SBI's principal office address is also 151 West 42nd Street, 15th Floor, New York, NY 10036.

37.   Sumitomo Pharma is a pharmaceutical company organized under the laws of Japan that, as of October 23, 2022, was 51.76% owned by Sumitomo Chemical, a Japanese manufacturer of chemicals, plastics, pharmaceuticals, and other products.

38.   Sumitomo Chemical is publicly-traded on the Tokyo Stock Exchange. As of September 30, 2022:

- 4.34% of Sumitomo Chemical was owned by Sumitomo Life

- 1.77% of Sumitomo Chemical was owned by Custody Bank of Japan, Ltd. (Sumitomo Mitsui Trust Bank, Ltd Retrust Account/Sumitomo Life Employee Pension Trust Account), and

- 1.41% of Sumitomo Chemical was owned by Sumitomo Banking

39.   Sumitomo Pharma, Sumitomo Chemical, Sumitomo Banking, Sumitomo Nikko, Sumitomo Trust  and Sumitomo Life are all members of the Sumitomo Group, one of the leading *keiretsu* in Japan. *Keiretsu* are networks of Japanese businesses connected by cross-shareholdings and informal business relations, which typically feature a bank that lends funds to other companies in the *keiretsu*. Those features are present here with Sumitomo Banking providing the funds necessary for Sumitomo Pharma (a Sumitomo Group member) and its affiliates to consummate

the Merger, and Sumitomo Banking owning an equity stake in Sumitomo Chemical (also a Sumitomo Group member, and the parent of Sumitomo Pharma).

40.     Members of the Sumitomo Group act in concert through the Sumitomo Group Public Affairs Committee, which engages in public relations activities to enhance public trust in the members of the Sumitomo Group, including publication of a quarterly newsletter. The Winter 2023 issue included remarks from Keiichi Iwata, Representative Director and President of *Sumitomo Chemical*, and Makoto Takashima, President, and CEO of *Sumitomo Banking*. The Spring 2023 issue included remarks from Toru Takakura, Director and President of Sumitomo Mitsui Trust Holdings, and Director of *Sumitomo Trust*.

41.     Adele M. Gulfo ("Gulfo") served as a member of the Board at all relevant times. Gulfo also served as Chief Commercial and Business Development Officer of Sumitovant at all relevant times. Gulfo presently serves as a member of the board of Sumitomo Pharma America, and CEO of the Biopharma Commercial Unit of Sumitomo Pharma America.

42.     Shigeyuki Nishinaka ("Nishinaka") served as a member of the Board at all relevant times. Nishinaka presently serves as a member of the board of Sumitomo Pharma America, and as a member of the board and senior executive officer of Sumitomo Pharma.

43.     Myrtle Potter ("Potter") served as Chairperson of the Board at all relevant times. Potter also served as CEO of Sumitovant at all relevant times. Potter presently serves as President and CEO, and Chair of the Board of Sumitomo Pharma America.

44.     Gulfo, Nishinaka and Potter are sometimes referred to below as the "Sumitomo Directors."

## SUBSTANTIVE ALLEGATIONS

**Myovant's Business**

45.    Myovant is a biopharmaceutical company that has completed multiple successful Phase 3 clinical trials of drugs addressing hormone-sensitive conditions (i.e., prostate cancer in men, and uterine fibroids and endometriosis in women) resulting in multiple regulatory approvals in the United States and Europe for three drugs: ORGOVYX, MYFEMBREE, and RYEQO. A second promising drug candidate for treatment of infertility—MVT-602—is presently in development.

46.    Myovant's three commercialized drugs are based on a molecule called "relugolix" that suppresses the release of sexual hormones such as testosterone, estrogen, and progesterone. ORGOVYX—used to treat prostate cancer in men—consists solely of relugolix, while MYFEMBREE and RYEQO—used to treat uterine fibroids and endometriosis in women—are combination tablets that consist of relugolix, and two other compounds: estradiol and norethindrone acetate. MYFEMBREE is the brand name of the combination tablet in the United States, and RYEQO is the brand name of the combination tablet in Europe.

47.    On December 18, 2020, the U.S. Food and Drug Administration ("FDA") approved ORGOVYX for the treatment of adult patients with advanced prostate cancer.

48.    On December 28, 2020, Myovant announced a collaboration and licensing agreement with Pfizer, Inc. ("Pfizer") to develop and commercialize relugolix in the United States and Canada for the treatment of prostate cancer, uterine fibroids, and endometriosis. The agreement provided for, among other things, Myovant to receive up to $4.2 billion in milestone payments based on regulatory approvals and sales targets, plus an equal share of the profits. Under the agreement, in early 2021, Pfizer and Myovant began promoting ORGOVYX for the treatment

of prostate cancer in the United States.

49.     On May 26, 2021, the FDA approved MYFEMBREE for the treatment of uterine fibroids. Thereafter, in mid-June 2021, Myovant and Pfizer launched MYFEMBREE in the U.S.

50.     On July 16, 2021, the European Commission approved RYEQO for the treatment of symptoms of uterine fibroids in Europe. Myovant collaborated with Gedeon Richter on the commercial launch of RYEQO in Europe in the second half of 2021.

51.     In October 2022, Myovant and Accord Healthcare, Ltd. launched ORGOVYX for the treatment of prostate cancer in Europe.

**Sumitovant Acquires a Controlling Stake in Myovant**

52.     In December 2019, Sumitovant acquired a majority of the shares in Myovant. In connection with the acquisition (i) Myovant and Sumitomo Pharma entered into a $400 million unsecured revolving debt financing agreement with Sumitomo Pharma as the lender ("Sumitomo Pharma Financing Agreement"), and (ii) Myovant, Sumitovant and Sumitomo Pharma entered into an investor rights agreement that prohibited Sumitovant, Sumitomo Pharma and/or Sumitomo Chemical from acquiring all or substantially all of Myovant's assets without, *inter alia*, the approval of a majority of the Minority Myovant Shareholders.

**Sumitovant Proposes to Acquire Myovant**

53.     On April 4, 2022, Sumitovant and Sumitomo Pharma submitted a letter to the Board requesting access to information concerning Myovant's business to conduct due diligence in connection with a potential proposal to acquire the remaining common shares of Myovant that Sumitovant did not already own. The letter advised that any transaction following such proposal would be subject to, *inter alia*, a non-waivable condition requiring the approval of a majority of Minority Myovant Shareholders.

**Formation of the Special Committee**

54.     On April 28, 2022, the Board formed the Special Committee, which consisted of Guinan, Curran and Valente (with Guinan serving as Chairman). The Special Committee was empowered to "(i) review and evaluate any proposal from Sumitovant or its affiliates in order to make a recommendation to the Board regarding whether Myovant should seek to engage in a potential transaction with Sumitovant; (ii) if it determined that Myovant should seek to engage in a potential transaction with Sumitovant, negotiate the terms of such transaction and make a recommendation to the full Board regarding whether Myovant should enter into such transaction; (iii) *identify, review and evaluate available alternatives to a potential transaction with Sumitovant*, *including remaining a separate company*; and (iv) recommend to the Board what further actions, if any, should be taken with respect to a potential transaction with Sumitovant or *any alternative thereto*."

55.     The same day, the Special Committee approved the engagement of (i) Goldman as its financial advisor; (ii) Cooley LLP ("Cooley") as its U.S. counsel; and (iii) Conyers Dill and Pearman Limited ("Conyers") as its Bermuda counsel, after first determining that such advisors "were not disqualified from being engaged by the Special Committee by virtue of any *potential conflicts of interest* with respect to a potential transaction with Sumitovant and [Sumitomo Pharma]."

56.     On May 21, 2022, the Special Committee provided Sumitovant with a subset of the due diligence information it had requested, and authorized Myovant management to provide additional due diligence information to Sumitovant and Sumitomo Pharma.

**The Skadden Conflicts**

57.    On June 28, 2022, the Special Committee determined to replace Cooley with Skadden as its counsel.  The Proxy advises that the Special Committee "determined to retain Skadden to serve as counsel to the Special Committee, based on, among other things, Skadden's qualifications, experience and reputation and ***the absence of conflicts on the part of Skadden***."

58.    Unbeknownst to Minority Myovant Stockholders, however, the statement that there was an "absence of conflicts on the part of Skadden" to serve as legal advisor to the Special Committee was false because of the Skadden Conflicts arising out of Skadden's *concurrent* and recent past representation of other members of the Sumitomo Group *keiretsu* in significant transactions (including Sumitomo Banking, which financed the Merger):

- On April 27, 2023—***less than two months after the Merger closed***—Jefferies, Sumitomo Banking, Sumitomo Nikko and other affiliated entities announced an expansion of their strategic alliance with Jefferies to collaborate on future corporate and investment banking business opportunities, as well as in equity sales, trading, and research. Among other things, Sumitomo Banking agreed to increase its ownership stake in Jefferies up to 15% (representing a financial commitment of $3.4 billion, including financing previously provided by Sumitomo Banking to Jefferies in 2021). ***Skadden represented Sumitomo Banking and Sumitomo Nikko*** (which was a continuation of Skadden's representation of Sumitomo Banking and Sumitomo Nikko when they first announced a strategic alliance with Jefferies on July 14, 2021, to collaborate on future corporate and investment banking business opportunities, ***less than a year before the Special Committee retained Skadden***).

- On June 28, 2022—***the same day that the Special Committee retained Skadden***—Marathon Capital announced that it had entered into a strategic collaboration with Sumitomo Banking to provide joint clients with comprehensive strategic and financial support to facilitate their global energy transition goals. ***Skadden represented Sumitomo Banking in connection with the collaboration.***

- On July 6, 2022—***just over a week after the Special Committee retained Skadden***—Apollo and Sumitomo Trust announced a strategic partnership pursuant to which Sumitomo Trust committed to invest $1.5 billion alongside Apollo in a portfolio of alternative assets. A press release announcing the partnership between Apollo and Sumitomo Trust quoted Mr. Takakura in his capacity as the President of Sumitomo Trust's parent, Sumitomo Mitsui Trust Holdings, Inc***. Skadden represented Sumitomo Trust in connection with the partnership***.

- On October 12, 2022, Socionext completed its IPO on the Tokyo Stock Exchange. ***Skadden represented Sumitomo Nikko as international joint lead manager in the listing and IPO***.

- On May 18, 2021, Skadden announced that it had advised the underwriters on Sumitomo Life's offering of $920 million in step-up callable subordinated notes due 2081.

59.    The Proxy explained that "[w]hile the Special Committee did not believe that Cooley was disqualified from acting as its legal counsel by virtue of any potential conflicts of interest related to Cooley's prior or ongoing representation of Myovant, the Special Committee determined to retain Skadden as legal counsel for the potential transaction with Sumitovant and [Sumitomo Pharma] based on Skadden's qualifications, experience and reputation in providing legal advice in connection with situations involving the type of transaction that Sumitovant and [Sumitomo Pharma] indicated they were considering." Cooley's website, however, indicates that Cooley also had the qualifications, experience, and reputation to advise the Special Committee in connection with negotiating a transaction with Sumitovant and Sumitomo Pharma. For example, Cooley has over 900 private and public biotechnology clients, including a representation in 2018 pursuant to which Cooley advised the "*special committee* of the board of directors of Crown Bioscience International, *a global drug discovery and development services company* on its merger agreement with JSR Corporation, *headquartered in Tokyo, Japan*."[15] As such, considering the Skadden Conflicts, it is very suspicious that the Special Committee abruptly decided to work with Skadden instead of Cooley (which had similar qualifications but did not appear to have any conflicts).

---

[15] See https://www.cooley.com/news/coverage/2017/2017-12-22-crown-bioscience-enters-merger-agreement (last visited on: October 13, 2023.

**Preparation of Myovant Projections**

60.     On June 28, 2022, Myovant's management and the Special Committee reviewed preliminary illustrative financial projections ("Initial Projections") for Myovant that, at the request of the Special Committee, had been prepared by management based on preliminary five-year projections ("March 2022 Five-Year Projections") that management had previously presented to the Board in March 2022 as part of Myovant's regular long-range planning process (as depicted in the following table annexed as Exhibit (c)(4) to the Rule 13e-3 Transaction Statement ("Transaction Statement") filed with the SEC on December 8, 2022, by Sumitomo Pharma and Myovant):[16]



61.     On July 7, 2022, the Special Committee met with members of Myovant

---

[16] The risk-adjusted revenue forecasts in the table adjust for the probability of achieving the non-risk adjusted revenue forecasts.

management, and Goldman and Skadden, to discuss the Initial Projections.

62.     On July 26, 2022, the Special Committee met with members of Myovant management, and Goldman and Skadden, to discuss information provided to Sumitovant in connection with its ongoing due diligence, and to review the assumptions underlying the Initial Projections. Goldman also advised the Special Committee that it had been advised by Sumitovant's financial advisor, J.P. Morgan, that Sumitovant and Sumitomo Pharma would only proceed to make a proposal after Myovant and Pfizer received a decision from the FDA regarding approval of MYFEMBREE for the treatment of endometriosis in pre-menopausal women.

63.     On August 3, 2022, the Special Committee met with members of Myovant management, and Goldman and Skadden ("August 3 Meeting"), to discuss revised preliminary illustrative financial projections from 2022 to 2036 using modified assumptions ("Revised Projections," and together with the "Initial Projections," the "Myovant Projections").   At the August 3 Meeting, Goldman shared a presentation ("August 3 Goldman Presentation") with multiple analyses ("August 3 Goldman Analyses"). Among the August 3 Goldman Analyses was a slide showing the Revised Projections (on a non-risk adjusted and risk-adjusted basis) (as depicted in the following table annexed as Exhibit (c)(5) to the Transaction Statement):



64.    Another analysis in the August 3 Goldman Presentation itemized key assumptions underlying the Revised Projections, including price increases and volume growth (as depicted in the following two tables in the August 3 Goldman Presentation annexed to the Transaction Statement):

**PRIVATE & CONFIDENTIAL – PRELIMINARY**



## Preliminary Illustrative Assumptions for Management Projections (1 of 2)

INVESTMENT BANKING DIVISION

| | Orgovyx | Myfembree | | | | [***] |
| | | UF | EM | [***]† | [***]† | |
|---|---|---|---|---|---|---|
| **Annual Price Increase** | 3% | 3% | | | | |
| **Volume Growth** | ~11% in FY2027E; stepped down to ~3% by FY2036E | ~8% in FY2027E; ~2% after FY2027E | | ~45% in FY2027E; ~33% in FY2028E – FY2030E; ~5% in FY2031E – FY2032E; 0% growth in FY2033E – FY2036E | | Revenue begins in FY2030E growing ~54% on average per year through FY2036E |
| **Gross-to-Net Price** | ~44% in FY2023E increasing to ~48% in FY2026E and increasing to ~52% in 2036E | ~50% in FY2023E increasing to ~55% in FY2026E and increasing to ~62% in FY2036E | ~50% in FY2023E increasing to ~55% in FY2026E and increasing to ~62% in FY2036E | ~40% in FY2023E increasing to ~69% in FY2036E | | |
| **Probability of Success** | 100% | 100% | 100% | 75% | 75% | 5% |

| **US Non-Risk-Adjusted Product Revenue ($ mm)** | | | | | | |
|---|---|---|---|---|---|---|
| **Analyst Median 2026E** | $588 | $192 | $139 | -- | -- | -- |
| **Management 2026E** | $1,303 | $402 | $392 | $38 | $30 | $0 |
| **Management Peak (2036E)** | $2,352 | $609 | $618 | $126 | $97 | $6,440 |

Source: Management Projections
Note: Management projections are preliminary and illustrative only, are based on a number of assumptions, are made only as of this date, and are subject to further review and adjustment. Actual results may differ materially based on changes in these assumptions and are subject to a number of risks and uncertainties, including those set forth in the Company's public filings. Revisions to assumptions and forecasts may be appropriate following review by, and input from, the Special Committee.
† Ex-US revenue for [***] and [***] are not included in management's projections.

9



## Preliminary Illustrative Assumptions for Management Projections (2 of 2)

INVESTMENT BANKING DIVISION

| **Collaboration Revenue** | ■ **Pfizer:** Terms based on signed collaboration agreement; aggregate of up to $2.3bn of development and sales milestones estimated through FY2036E<br>■ **Accord:** Terms based on signed collaboration agreement and ex-US Orgovyx revenue projections from Project Athena projections; aggregate of $0.3bn of royalties and milestones through FY2036E with additional $50mm upfront payment accounted for in cash balance<br>■ **Gedeon Richter:** Terms based on signed collaboration agreement and ex-US Myfembree revenue projections provided by Gedeon Richter through FY2030E. Beyond FY2030E revenue assumed to grow 3% YoY FY2030E-FY2032E, consistent with 2029 revenue growth, and 1% YoY FY2032E-FY2036E; aggregate of $0.3bn of royalties and milestones through FY2036E<br>■ **Takeda:** Royalties receivable of [***]% from Takeda in certain Asian countries not reflected within forecast due to immateriality and lack of reliable estimates |
|---|---|
| **Cost Assumptions** | ■ **COGS** (% Net Revenues): 3.0% for non-[***] indications in all projected years, consistent with approach in Wildcat latest LRP; [***] COGS per Wildcat latest [***] projections (15% of net [***] revenue)<br>■ **SG&A** (% Net Revenues): beyond FY2026E is projected as 16% of non-[***] revenue, consistent with FY2026E margin in Wildcat latest LRP; [***] SG&A expense per Wildcat latest [***] projections (6% net [***] revenue in 2036E)<br>■ **R&D** (% of Net Revenues): beyond FY2026E is projected as 2% increase in non-[***] R&D spending to adjustment for inflation; [***] R&D expense per Wildcat latest [***] projections ($75mm cumulative R&D expense)<br>■ **Takeda Royalty:** [***]% of Orgovyx and [***]% of Myfembree product revenue booked by Wildcat<br>■ **Collaboration Expense to Pfizer:** 50% of gross profit, after taking Takeda royalty into account (royalties receivable of [***]% from Takeda in certain Asian countries not reflected within forecast due to immateriality and lack of reliable estimates) |
| **Cash Flow Items** | ■ **Working Capital:** Estimated to be 5% of change in product sales<br>■ **Capital Expenditures:** $2.4mm per year over projection period, consistent with Wildcat preliminary LRP available until FY2026E<br>■ **Depreciation:** $1.4mm per year throughout projection period, consistent with Wildcat preliminary LRP available until FY2026E |
| **Tax** | ■ 14% corporate effective tax rate based on Wildcat guidance<br>■ **NOLs and R&D Tax Credits**<br>— $1,027mm of NOLs available for utilization per latest Wildcat filings<br>— Assumes accumulation and use of $2mm R&D tax credit each year per Wildcat input |
| **Capitalization** | ■ **Shares Outstanding:** Capitalization as of 12-Jul-2022 per management<br>— 95.72mm common shares outstanding<br>— 5.9mm options outstanding with a weighted average strike price of $10.82†; 7.3mm RSUs; 0.9mm PSUs, 0.05mm warrants at $15.06 exercise price and 0.02mm warrants at $18.82 exercise price<br>■ **Cash balance:** $359mm (per 30-Jun-2022 10Q, inclusive of $50mm upfront payment from Accord partnership)<br>■ **Debt:** $359mm as of 30-Jun-2022 (loan from Sparrow matures in 2025) |

Source: Management Projections Note: Management projections are preliminary and illustrative only, are based on a number of assumptions, are made only as of this date, and are subject to further review and adjustment. Actual changes in these assumptions and are subject to a number of risks and uncertainties, including those set forth in the Company's public filings. Revisions to assumptions and forecasts may be

65.    Notably, the first table above shows that the projections of Myovant's management for US Non-Risk-Adjusted Product Revenue from sales of ORGOVYX and MYFEMBREE were far more optimistic than the projections of Myovant's Wall Street analysts for these two drugs.

66.    Another analysis in the August 3 Goldman Presentation provided valuation ranges for Myovant shares of $25.54 to $30.70 per share based on a DCF analysis of projected unlevered free cash flows from 2022 to 2036 derived from the Revised Projections (with cash flows discounted at rates of 12%-14%) (as depicted in the following table in the August 3 Goldman Presentation annexed to the Transaction Statement):



67.    On August 5, 2022, after the markets closed, Myovant and Pfizer announced receipt of FDA approval for MYFEMBREE for the management of moderate to severe pain associated with endometriosis in pre-menopausal women. This was the second indication for which

MYFEMBREE was approved for use in the United States (the first being for treatment of uterine fibroids).

68.    Upon the news, Myovant's common stock increased 22.3% from a close of $15.12 per share on August 5, 2022, to a close of $18.49 per share on August 12, 2022.

69.    On August 22, 2022, the Special Committee met with Goldman and Skadden. Goldman updated the Special Committee on communications with J.P. Morgan regarding Sumitovant's evaluation of whether to pursue a possible transaction, including with respect to due diligence information. Goldman also reviewed the Revised Projections ("August 22 Meeting"). Thereafter, the Special Committee instructed Goldman to use the Revised Projections in its analyses.  As the Proxy confirms, "[t]he Revised Projections were used by Goldman with the Special Committee's approval for purposes of preparing Goldman's financial analyses and fairness opinion provided to the Special Committee on October 23, 2022, in connection with the Special Committee's consideration of the transactions contemplated by the Merger Agreement." Likewise, the Proxy also states that "the Revised Projections are the final projections that were made available to, and relied upon by, the Special Committee, the Myovant Board (other than the Sumitomo Directors) and Goldman in connection with their evaluation of the proposed transaction with Sumitovant and [Sumitomo Pharma]." The Special Committee did not, however, direct Goldman to share the Revised Projections with J.P. Morgan.

**In Consultation with Goldman and a Conflicted Skadden, the Special Committee Determines Not to Reach Out to Potentially Interested Third Parties**

70.    At the August 22 Meeting, the Special Committee also discussed with Goldman and a conflicted Skadden, "the possibility of conducting outreach to potential third parties other than Sumitovant in advance of receiving a proposal from Sumitovant." Following such discussion, the Special Committee "determined *not* to reach out to third parties at that time." During such

discussion, the Proxy states that the Special Committee considered, among other things:

> the risk that Sumitovant and [Sumitomo Pharma] would be unwilling to support a sale of Myovant to a third party which could make any outreach futile, the likelihood that few parties other than one of Myovant's current commercial partners would be interested in a transaction and the potential negative impact on Myovant and its relationships with third parties if such outreach were to become known, that the Special Committee could determine to reach out to third parties at a later time, and the expectation that any merger agreement that might ultimately be entered into with Sumitovant would be expected to allow the Special Committee to consider unsolicited inbound acquisition proposals that might be made.

71.    The Special Committee's decision at the August 22 Meeting not to reach out to third parties—based on its discussions in which a conflicted Skadden participated—prevented Minority Myovant Shareholders from receiving full and fair value for their Myovant shares. The Special Committee had specifically been empowered to "***identify, review and evaluate available alternatives to a potential transaction with Sumitovant***." Yet, it summarily concluded—without any effort whatsoever to reach out to other potential counterparties—that attempting to identify alternatives would be "futile" considering Sumitovant's self-serving assertion that it and Sumitomo Pharma would not support an alternative transaction. The Special Committee could have easily tested the strength of that resolve by conducting a robust market check. And even if, as a practical matter, Sumitovant had the power to block any alternative transaction at a higher price, securing indications of interest at higher prices from third parties through a robust market check would have dramatically improved the Special Committee's negotiating leverage to extract a higher price from Sumitovant. Indeed, the August 5, 2022, approval of the FDA to use MYFEMBREE to treat endometriosis provided the Special Committee with a golden opportunity to assert itself more forcefully in negotiations since it knew how important that approval was to Sumitovant's value thesis.

72.    Instead, after discussions in which a conflicted Skadden participated, the Special

Committee squandered its opportunity to conduct a robust market check, and chose to deprive itself of negotiating leverage by adopting a "controlled mindset" under which it entertained only two options, i.e., "yes" or "no" to a deal with Myovant's controlling shareholder. Sumitovant and Sumitomo Pharma understood the difficult negotiating position in which the Special Committee had put itself, and took full advantage by submitting a "best and final offer" that fell ***below*** the high end of the valuation that its own financial advisor, J.P. Morgan, had attributed to Myovant (*see* paragraphs 77-83 *infra*).

73.    The considerations cited in the Proxy for the path that the Special Committee took (i.e., no outreach to third parties), based on discussions in which a conflicted Skadden participated, do not withstand scrutiny. The assumption "that few parties other than one of Myovant's current commercial partners would be interested in a transaction," was entirely speculative since that assumption was never tested once the Special Committee, after discussions in which a conflicted Skadden participated, concluded that outreach would be "futile." And while at the August 22 Meeting, the Special Committee observed that it could "reach out to third parties at a later time," that never happened since, after further discussions on October 2, 2022  in which a conflicted Skadden also participated (*see* paragraph 87 *infra*), the Special Committee continued to conclude that outreach would be futile for the same reasons determined at the August 22 Meeting. Finally, while the Special Committee noted that any merger agreement "would be expected to allow the Special Committee to consider unsolicited inbound acquisition proposals that might be made," the Proxy acknowledges that the provision in the Merger Agreement barring Myovant from actively soliciting competing acquisition proposals after the signing of the Merger Agreement was a factor weighing *against* approval of the Merger, and that the provision in the Merger Agreement obligating Myovant to pay Sumitovant a termination fee of $55,250,000 in connection with a

termination of the Merger due to entry of Myovant into an alternative transaction could "discourage the making of a competing acquisition proposal or adversely impact the price offered in such a proposal." In other words, the provisions of the Merger Agreement only further depressed the likelihood of an alternative transaction emerging.

74.    In sum, the Proxy reflects that a conflicted Skadden actively participated in the decision of the Special Committee to nix the option of reaching out to third parties, thereby weakening the Special Committee's negotiating leverage, at a time when it harbored an incentive to discourage solicitation of competing bids because of its *concurrent* representation of the bank financing the Merger (Sumitomo Banking), as well as fellow members of Sumitomo Pharma and Sumitomo Chemical in the Sumitomo Group.

75.    Had Skadden advised the Special Committee to reach out to other potential counterparties, and conduct a robust market check, to strengthen the Special Committee's negotiating leverage with Sumitovant—and one or more competing bidders had emerged because of those efforts—Myovant would have almost certainly negotiated a deal at a higher price (if not with Sumitovant, then with a competing bidder). Such advice, however, might have resulted in Skadden's *concurrent* client, Sumitomo Banking, losing the opportunity to close on its $1.7 billion financing of the Merger, and Sumitomo Pharma and Sumitomo Chemical—both members of the Sumitomo Group—losing the opportunity to acquire Myovant (through Sumitovant). The prospect of providing advice to the Special Committee that would enable an alternative winning bidder, and thereby (i) cost its longstanding and ongoing client, Sumitomo Banking, profits from a $1.7 billion financing, and (ii) potentially affect its ongoing relationships with multiple members of the Sumitomo Group (after causing Sumitomo Pharma and Sumitomo Chemical to lose the opportunity to acquire Myovant), provided Skadden with an incentive to skew its advice to the

Special Committee towards consummating a deal with Sumitovant and *against* reaching out to other potential counterparties to increase the Special Committee's negotiating leverage against Sumitovant.

**The September 15 ORGOVYX Sales Update**

76.    On September 15, 2022, the Board held a regularly scheduled meeting with Myovant management. During the meeting, Myovant management presented a financial update based on year-to-date results, which included an update ("Sept 15 ORGOVYX 2022 Sales Update") on projected fiscal year 2022 ORGOVYX revenues, which purportedly were likely to be lower than reflected in the projections for fiscal year 2022 ORGOVYX revenues previously provided by Myovant management to the Board. Goldman, however, never modified the Revised Projections in any of its subsequent presentations to the Special Committee to take the Sept 15 ORGOVYX 2022 Sales Update into account. It is thus clear that Goldman did not believe that the Sept 15 ORGOVYX 2022 Sales Update required any modification of the Revised Projections. Moreover, the Special Committee never deemed the Sept 15 ORGOVYX 2022 Sales Update as a relevant consideration in its negotiations with Sumitovant—that is, until October 23, 2022, when confronted with a purportedly "best and final offer" of $27.00 per share from which it appeared Sumitovant would not budge, the Special Committee used the Sept 15 ORGOVYX 2022 Sales Update as a justification to accept the $27.00 per share bid—a price that fell towards the lower end of the valuation ranges determined by Goldman, and below what Sumitovant would have been willing to pay based on the analysis of J.P. Morgan. *See* paragraph 105 *infra.*

**Sumitomo Pharma's Financial Advisor, J.P. Morgan, Values**
**Myovant at Higher Prices Than the Merger Consideration**

77.    As noted, the Initial Projections and Revised Projections had been based on the March 2022 Five-Year Projections. Myovant management provided the March 2022 Five-Year

Projections to J.P. Morgan, but did not share the Initial Projections or the Revised Projections with J.P. Morgan. As the Proxy states, "[t]he Financial Projections [i.e., Initial and Revised Projections] included in this proxy statement, *other than preliminary five-year projections that had been presented by management to the Myovant Board in March 2022 and subsequently shared with J.P. Morgan*, which were subsequently incorporated into the Financial Projections, were *not* shared with the Purchaser Filing Persons [i.e., Sumitovant or Sumitomo Pharma] *or their advisors* prior to the execution of the Merger Agreement."

78.    Sumitovant instead prepared its own projections for ORGOVYX and MYFEMBREE (based on budgets and other information provided by Myovant) that were considerably less optimistic than the Revised Projections, and provided these to J.P. Morgan to use in connection with its financial analyses ("Sumitovant Projections"):

| FYE Mar-31 $ in millions | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Revenue | $ 610 | $1,159 | $1,545 | $2,120 | $ 2,100 | $ 2,316 | $1,521 | $2,057 | $1,785 | $ 1,888 | $ 1,899 | $1,763 | $1,817 | $2,140 |
| Cost of Goods Sold (incl. collaboration expense to Pfizer) | $(328) | $ (577) | $ (785) | $ (971) | $(1,125) | $(1,254) | $ (804) | $ (882) | $ (956) | $(1,013) | $(1,019) | $ (943) | $ (972) | $ (993) |
| Adj. Gross Profit | $ 282 | $ 582 | $ 760 | $1,149 | $ 976 | $ 1,061 | $ 717 | $1,175 | $ 829 | $ 875 | $ 880 | $ 821 | $ 845 | $1,147 |
| EBIT | $(127) | $ 217 | $ 373 | $ 707 | $ 518 | $ 601 | $ 441 | $ 913 | $ 573 | $ 610 | $ 606 | $ 537 | $ 552 | $ 845 |
| NOPAT | $(137) | $ 204 | $ 357 | $ 687 | $ 481 | $ 510 | $ 375 | $ 783 | $ 488 | $ 520 | $ 517 | $ 457 | $ 470 | $ 723 |
| FCF | $(200) | $ 115 | $ 283 | $ 621 | $ 426 | $ 463 | $ 537 | $ 755 | $ 462 | $ 499 | $ 515 | $ 484 | $ 459 | $ 716 |

79.    The projected revenue for ORGOVYX and MYFEMBREE in the Revised Projections is larger than the projected revenue for ORGOVYX and MYFEMBREE in the Sumitovant Projections beginning in 2025:

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | YEAR | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 |
| 2 | Revised Rev. Projections | $597 | $1,125 | $1,656 | $2,149 | $2,334 | $2,582 | $2,695 | $2,816 | $2,953 | $3,084 | $3,236 | $3,394 | $3,565 | $3,747 |
| 3 | Sumitovant Rev. Projections | $610 | $1,159 | $1,545 | $2,120 | $2,100 | $2,316 | $1,521 | $2,057 | $1,785 | $1,888 | $1,899 | $1,763 | $1,817 | $2,140 |
| 4 | *Myovant > Sumitovant* | ($13) | ($34) | $111 | $29 | $234 | $266 | $1,174 | $759 | $1,168 | $1,196 | $1,337 | $1,631 | $1,748 | $1,607 |

80.    On September 27, 2022, J.P. Morgan shared a presentation ("September 27 J.P. Morgan Presentation") with the board of directors of Sumitomo Pharma (as depicted in the following table annexed as Exhibit (c)(2) to the Transaction Statement):



81.     As per the table above, the key valuation analysis performed by J.P. Morgan was its DCF analysis, which generated a value range **$22.50 to $29.50 per share** based on an analysis of cash flows derived from *Sumitovant Projections* discounted at rates of 8.25%-12.25%. For reference only, J.P. Morgan also derived a value range of **$20.00 to $28.00 per share** based on premiums to the unaffected stock price in precedent minority squeeze out transactions *both* in *and* outside the biotech industry. Finally, for reference only, J.P. Morgan depicted the range of Wall Street price targets and the 52-week trading range of Myovant's stock price.

82.     Under either of J.P. Morgan's valuation analyses, Sumitovant could have justified paying more than $27.00 per share for Myovant—up to $29.50 per share under J.P. Morgan's DCF analysis, and up to $28.00 per share under J.P. Morgan's premium paid analysis. Additionally, J.P.

Morgan's DCF analysis was undertaken using only the Sumitovant Projections since the Revised Projections were never shared with J.P. Morgan. Had the Revised Projections been provided to J.P. Morgan, J.P. Morgan's DCF analysis would have certainly attributed an even higher value range to Myovant than $22.50 to $29.50 per share because, as shown above, the Revised Projections forecast greater sales for ORGOVYX and MYFEMBREE than the Sumitovant Projections beginning in 2025 and through 2036. Specifically, using the Revised Projections and a discount rate range of 12%-14%—considerably *higher* than the 8.25%-12.25% discount rate used in J.P. Morgan's DCF analysis—Goldman's DCF analysis attributed a value range of $25.63 to $30.79 per share to Myovant. Since, in a DCF analyses, a *higher* discount rate *decreases* valuations and a *lower* discount rate *increases* valuations (*see In re Topps Co. S'holders Litig.*, 926 A.2d 58, 76 (Del. Ch. 2007)), J.P. Morgan would have generated a *higher* valuation range than Goldman's $25.63 to $30.79 per share if had J.P. Morgan applied its *lower* discount rate range of 8.25%-12.25% to the Revised Projections.

83.     Given that providing the Revised Projections to J.P. Morgan would have yielded a higher value range, and thus justified a higher bid by Sumitovant, the fact that the Special Committee never provided the Revised Projections to J.P. Morgan is highly suspicious.

**Sumitovant's September 30, 2022, Proposal**

84.     On September 30, 2022, Potter delivered a non-binding proposal ("September 30 Proposal") to the Special Committee, on behalf of Sumitovant, offering to acquire all the Myovant common shares not already owned by Sumitovant for $22.75 per share. In the proposal, Sumitovant and Sumitomo Pharma stated that they were only interested in acquiring additional Myovant common shares and not interested in selling any of the Myovant common shares that Sumitovant owned or supporting any alternative sale, merger or similar transaction involving

Myovant. The proposal further noted that the proposed transaction would be subject to a non-waivable condition requiring the approval of a majority of Minority Myovant Shareholders.

85.     On October 1, 2022, the Special Committee met with Goldman and Skadden to discuss the September 30 Proposal. Following evaluation and discussion of the offer price and other terms of the proposal, the Special Committee determined that the proposal significantly undervalued Myovant and, therefore, was not in the best interests of Myovant or its shareholders. The Special Committee also determined not to engage further on Sumitovant's due diligence requests. Goldman conveyed the Special Committee's decision to J.P. Morgan.

86.     At the same meeting, Goldman shared a presentation ("October 1 Goldman Presentation") with the Special Committee. Most of the assumptions, projections and other analyses in the October 1 Goldman Presentation were the same that appeared in the August 3 Goldman Analyses in the August 3 Goldman Presentation (notwithstanding the Sept 15 ORGOVYX 2022 Sales Update provided to the Board just *two weeks earlier*). The October 1 Goldman Presentation, however, slightly increased the valuation range under the DCF analysis from $25.54 to $30.70 per share to $25.63 to $30.79 per share (which is the valuation range that appeared in the fairness opinion ("Fairness Opinion") provided to the Special Committee by Goldman on October 23, 2022). The October 1 Goldman Presentation also provided a price range of $25.34 to $36.39 per share based on an analysis of premiums paid in minority squeeze outs involving biotechnology companies. This premia analysis and value range also appeared in the Fairness Opinion.

87.     On October 2, 2022, the Special Committee met with Goldman and Skadden to discuss Myovant's communications plan in response to a press release that Sumitovant and Sumitomo Pharma were expected to issue concerning the September 30 Proposal. The Special

Committee again discussed with Goldman and a conflicted Skadden the possibility of conducting outreach to potential third parties other than Sumitovant after public announcement of the September 30 Proposal to determine if any third parties had interest in a potential transaction with Myovant. Following such discussion, the Special Committee *again* determined not to do so based on the same considerations against outreach discussed at the August 22 Meeting, and the fact that the September 30 Proposal would put any potential bidders on notice of the opportunity to come forward with a proposal if they were interested. As noted above, this decision—emerging out of discussions in which a conflicted Skadden participated—sharply limited the Special Committee's negotiating leverage and put it in the position of having only two options on the table, i.e., a sale to Sumitovant or remaining independent. Had the Special Committee instead acted with a different mindset and exercised its power to seek out and consider alternative transactions, it could have dramatically increased its negotiating leverage and been able to extract a better price from Sumitovant. As such, given Skadden's active participation in the decision of the Special Committee to nix the option of reaching out to third parties, the undisclosed Skadden Conflicts contributed to a loss in value to Minority Myovant Shareholders that could have otherwise been secured by conducting a robust market check and aggressively testing the assertion of Sumitovant that it would not approve any alternative transaction. Skadden had an incentive to recommend against reaching out to potential third parties because had a competing bidder emerged and prevailed, it would have (i) cost Skadden's concurrent client, Sumitomo Banking, the opportunity to finance the Merger for $1.7 billion, and (ii) affected Skadden's relationships with other members of the Sumitomo Group (after causing Sumitomo Pharma and Sumitomo Chemical—both members of the Sumitomo Group—to lose the opportunity to acquire Myovant through their subsidiary, Sumitovant).

88.     Later on October 2, 2022, Sumitovant and Sumitomo Pharma issued a press release ("Sumitomo Press Release") announcing the September 30 Proposal for $22.75 per share. The Sumitomo Press Release stated, *inter alia*, that (i) "[t]he Proposal provides that the proposed transaction will be subject to the approval of the shareholders of Myovant holding a majority of the shares not owned by Sumitovant, and (ii) "Sumitovant and Sumitomo Pharma are  interested only in acquiring the shares of Myovant not already owned by Sumitovant and that in such capacity, Sumitovant has no interest in selling any of the Myovant shares it owns, nor would Sumitovant support any alternative sale, merger, or similar transaction involving Myovant."

89.     Later that day, Myovant issued its own press release ("Myovant Press Release") stating, *inter alia*, that after carefully reviewing the September 30 Proposal, the Special Committee had determined that "it ***significantly undervalues*** the Company," but remained "open to considering any improved proposal that reflects the full and fair value of the Company and is otherwise in the best interests of the Company and its shareholders, and is prepared to engage further with Sumitomo regarding any such proposal." The Myovant Press Release, however, did little to push back against the statement in the Sumitomo Press Release that Sumitovant would not support an alternative transaction. Instead, the Myovant Press Release merely stated that the Special Committee was formed to evaluate Sumitovant's proposal "and any alternatives thereto," which certainly would not have inspired confidence in third parties that alternative proposals were welcome and would be considered by the Special Committee. As discussed in the next section, only one potential counterparty reached out.

**Company "A" Reaches Out to Goldman About a Potential Transaction**

90.     On October 5, 2022, Goldman, and representatives of a third party ("Company A"), a large pharmaceutical company, discussed the announcement of the September 30 Proposal.

Company A informed Goldman that it was evaluating a possible transaction with Myovant. A supplement to the Proxy states that "Myovant was not requested to, and did not, enter into" a non-disclosure or confidentiality agreement with Company A. But to facilitate a competing bid, the Special Committee could have proactively proposed to Company A to enter into a non-disclosure or confidentiality agreement, which would have enabled the Special Committee to provide Company A with the confidential information necessary to formulate a competing bid. The Special Committee's failure to seek to enter into a non-disclosure or confidentiality agreement with Company A thus evidences the lack of seriousness with which the Special Committee treated the overture from Company A.

91.    Later that same day, the Special Committee met with Goldman and Skadden. Goldman reported on the discussion they had with representatives of Company A, noting that Company A was evaluating a potential transaction with Myovant, but "that Company A did not believe it likely that it would propose a transaction given that Sumitovant and [Sumitomo Pharma] had publicly stated that Sumitovant was not willing to sell its Myovant shares and would not support an alternative merger, consolidation or similar transaction with a third party involving Myovant." Notably, after discussions with Goldman and a conflicted Skadden, the Special Committee did not authorize any further discussions with Company A to dispel its perception that submitting a competing proposal would be futile. Instead, the discussion at the October 5, 2022, meeting promptly shifted to Sumitovant's and Sumitomo Pharma's proposal earlier that day that the parties move forward with further due diligence and commence negotiation of transaction documents once Sumitovant and Sumitomo Pharma confirmed their willingness to make an improved proposal at or near recent trading prices of Myovant's common shares (which closed at $25.48 per share on October 4, 2022).

92.     Following such discussion, the Special Committee determined to permit Sumitovant and Sumitomo Pharma to continue due diligence and commence merger agreement negotiations, subject to Sumitovant and Sumitomo Pharma confirming their understanding that they would need to increase their proposed price significantly beyond the current trading price to obtain the Special Committee's ultimate support of any transaction. The Special Committee authorized Goldman to convey to J.P. Morgan, that Sumitovant should be looking to provide a value *near $30.00 per share*, which representatives of Goldman did later that day. The Proxy does not reflect, however, that the Special Committee provided any guidance or instruction to Goldman concerning further outreach to Party A, as if a deal with Sumitovant was the only option on the table and a foregone conclusion. Nor does the Proxy reflect any further effort to engage with Party A. The Special Committee, advised by Goldman and a conflicted Skadden, thus squandered an opportunity to develop a competing bid from Company A that would, at a minimum, have put pressure on Sumitovant to maximize its bid.

93.     On October 11, 2022, Company A informed Goldman that after carefully considering the opportunity for a potential transaction with Myovant and discussing the opportunity internally, Company A had determined that it would not submit a proposal for a transaction with Myovant. Goldman informed the Chairman of the Special Committee.

94.     On October 17, 2022, the Special Committee met with CEO Marek (with Goldman and Skadden in attendance). At the request of the Special Committee, Marek discussed the need for employee retention to ensure business continuity during the period between signing and closing of a transaction and reviewed management's proposal for employee retention in connection with any possible transaction with Sumitovant and Sumitomo Pharma. At the request of the Special Committee, Marek exited the meeting, and Skadden thereafter reviewed key business and legal

issues in the latest draft of the agreement governing the Merger provided by Sumitovant's and Sumitomo Pharma's legal advisor, Sullivan & Cromwell. Goldman also discussed with the Special Committee that Company A had determined not to submit a proposal for a transaction with Myovant. The Proxy does not reflect any instruction from the Special Committee to Goldman to reach out to Company A to consider changing its mind and submitting a competing bid. In short, after deciding not to reach out to other potential counterparties (as a result of discussions in which a conflicted Skadden participated), the Special Committee simply let Company A's interest wither and die.

95.    On October 19, 2022, Potter and Guinan met by phone with Skadden and Sullivan & Cromwell to discuss most of the remaining open issues, apart from price, including, among other things, (i) certain compensation and benefits matters, including with respect to employee retention and severance protections, (ii) post-closing employee compensation and benefits matters, and (iii) the amount of the termination fee payable in the event of certain terminations of the Merger Agreement. The amount of the price per share payable in the Merger and the size of the proposed termination fee remained unresolved following the call.

96.    On October 20, 2022, the Sumitomo Pharma board of directors met with Sullivan & Cromwell and J.P. Morgan. During such meeting, after reviewing the terms of the draft Merger Agreement and Sumitovant's due diligence regarding Myovant, the Sumitomo Pharma board of directors approved the delivery of a subsequent offer to Myovant of up to a per share price of $27.00, subject to final approval by the board of directors of Sumitovant (of which Potter and Nishinaka were members). As noted, however, J.P. Morgan's DCF analysis presented to the Sumitomo Pharma board of directors on September 27, 2022, justified a price as high as $29.50 per share (and that was without the benefit of J.P. Morgan undertaking a DCF analysis of the

39

Revised Projections).

**Sumitovant's October 2022 Proposals**

97.     On October 21, 2022, J.P. Morgan conveyed to Goldman a revised oral proposal ("First October 21 Proposal") from Sumitovant and Sumitomo Pharma to acquire the outstanding Myovant common shares not already owned by Sumitovant for $25.25 per share. Later that same day, the Special Committee met with Goldman and Skadden to discuss the First October 21 Proposal. At the request of the Special Committee, Marek joined the meeting and provided management's perspectives on the proposal and then exited the meeting. The Special Committee authorized Goldman to advise J.P. Morgan that the Special Committee was unwilling to accept Sumitovant's and Sumitomo Pharma's offer of $25.25 per share, and that Sumitovant and Sumitomo Pharma would need to *significantly* increase their offer price for the Special Committee to support a transaction.

98.     Later on October 21, 2022, J.P. Morgan conveyed to Goldman a revised proposal ("Second October 21 Proposal") from Sumitovant and Sumitomo Pharma to acquire the outstanding Myovant common shares not already owned by Sumitovant for $26.25 per share. J.P. Morgan indicated that this price reflected Sumitovant's and Sumitomo Pharma's views of Myovant's fundamental value and that Sumitovant and Sumitomo Pharma had limited ability to increase their proposal from that price. Thereafter, the Special Committee met again with Goldman and Skadden to discuss the Second October 21 Proposal. To that end, Goldman shared a presentation ("October 21 Goldman Presentation") with the Special Committee. The assumptions, projections and other analyses in the October 21 Goldman Presentation did not materially differ from those in the October 1 Goldman Presentation (except for adjusting the valuation range under the DCF analysis to $25.59 to $30.74 per share).

99.     At the request of the Special Committee, Marek joined the meeting to provide management's perspectives on the proposal, following which he exited the meeting. Following further discussion, the Special Committee authorized Goldman to inform J.P. Morgan that the Special Committee sought a higher offer price *approaching $30.00 per share* and that further negotiation of price, if any, should be conducted between Guinan and Potter directly.

100.     On October 22, 2022, Potter called Guinan and conveyed a further updated proposal ("October 22 Proposal") to acquire the outstanding Myovant common shares not already owned by Sumitovant for $26.75 per share. Guinan indicated that he did not believe that the Special Committee would be supportive of a transaction at that price, to which Potter indicated that $27.00 per share was the best and final price she was able to offer. Later that same day, the Special Committee met with Goldman and Skadden to discuss the October 22 Proposal. To that end, Goldman shared a presentation ("October 22 Goldman Presentation") with the Special Committee. The assumptions, projections and other analyses in the October 22 Goldman Presentation did not materially differ from those in the October 1 Goldman Presentation.

101.     Following discussion, the Special Committee determined to request a purchase price of $28.50 per share and authorized Guinan to convey to Potter the Special Committee's counter-proposal of at least $28.50 per share.

102.     Later on October 22, 2022, Guinan called Potter and conveyed the Special Committee's counter-proposal that Sumitovant and Sumitomo Pharma increase their offer to at least $28.50 per share. Potter indicated that she did not have authorization to offer above $27.00 per share, but would communicate the Special Committee's request for at least $28.50 per share to Sumitovant and Sumitomo Pharma. Later in the evening on October 22, 2022, Potter called Guinan to inform him that $27.00 per share was Sumitovant's and Sumitomo Pharma's best and

final offer, and that the transaction would not move forward if the Special Committee required a higher price than $27.00 per share. Guinan noted that he would report that to the Special Committee and would speak with Potter the following morning.

103.   On October 23, 2022, the Special Committee met with Goldman and Skadden. Guinan updated the Special Committee on his discussion with Potter, noting that Potter informed him that $27.00 per share was Sumitovant's and Sumitomo Pharma's best and final offer, and that the transaction would not move forward if the Special Committee requested a higher price than $27.00 per share. Agreeing to a deal price of $27.00 per share, however, was problematic for the Special Committee since it was the low end of the fairness range determined by the most credible of Goldman's analyses. Those analyses had consistently showed that Myovant was worth between (i) $25.59 to $30.74 per share based on a DCF analysis, (ii) $25.34 to $36.39 per share based on an analysis of premiums paid in select minority squeeze out transactions involving biotechnology companies only ("Biotech Premia Analysis"), and (iii) $20.65 to $26.04 per share based on an analysis of premiums paid in select minority squeeze out transactions over $1 billion in value across all industries since 2012 ("$1B Txn Premia Analysis"). The $1B Txn Premia Analysis, however, relied on several older transactions involving companies outside the biotech industry going back as far as 2012, thus rendering it far less credible than the Biotech Premia Analysis, which was based on transactions in 2020 involving comparable biotech companies:



## Precedent Squeeze Out Transactions
### Selected Precedent Minority Squeeze Out Transactions

INVESTMENT BANKING
DIVISION

| | Announce Date | Target | Acquiror | Value ($mm) | Final Bid | 1-Day Premium |
|---|---|---|---|---|---|---|
| Biotech | 12-Nov-2020 | Urovant | Sumitovant | $681.0 | $16.25 | 102.6% |
| | 05-Oct-2020 | Eidos Therapeutics | BridgeBio | 1,651.6 | 73.26 | 41.1 |
| | 31-Aug-2020 | Akcea Therapeutics | Ionis | 500.0 | 18.15 | 59.5 |
| | 21-Feb-2020 | AVX | Kyocera | 1,046.1 | 21.75 | 44.6 |
| | 24-Jul-2019 | Speedway Motorsports | Sonic Financial | 234.3 | 19.75 | 41.7 |
| | 22-May-2019 | International Speedway | NASCAR | 1,128.4 | 45.00 | 15.2 |
| | 09-May-2019 | EMC Insurance | Employers Mutual Casualty | 372.2 | 36.00 | 50.1 |
| | 19-Jun-2018 | Foundation Medicine | Roche | 2,260.9 | 137.00 | 28.7 |
| | 01-Mar-2018 | AmTrust Financial Services | Evergreen Parent | 1,327.5 | 14.75 | 45.3 |
| | 06-Sep-2016 | Federal-Mogul | Icahn Enterprises | 304.5 | 10.00 | 100.8 |
| | 25-Jul-2016 | National Interstate | Great American Insurance | 311.6 | 32.50 | 46.0 |
| | 01-Mar-2013 | Sauer-Danfoss | Danfoss | 692.9 | 58.50 | 48.6 |
| | 17-Dec-2012 | Clearwire | Sprint Nextel | 3,329.8 | 2.97 | 33.8 |

104.    Further, after discussions in which a conflicted Skadden participated on August 22, 2022, and October 1, 2022, the Special Committee determined not to reach out to other potential third parties—and thereafter declined to meaningfully engage with Company A—thus leaving the Special Committee with no other options other than to accept the "final and best offer" of $27.00 per share, or to say no to its controlling shareholder.

105.    Having put itself in that difficult negotiating position, the Special Committee quickly needed a justification to accept the "final and best offer" of $27.00 per share, especially after it had previously insisted on $30.00 per share, or at least $28.50 per share. To that end, the Special Committee asked Marek and Myovant's Chief Financial Officer, Uneek Mehra, to join the meeting, review the Sept 15 ORGOVYX 2022 Sales Update (projecting lower sales of ORGOVYX in 2022), and respond to questions from the Special Committee. Marek and Mehra then exited the meeting. Despite never having discussed the impact of the Sept 15 ORGOVYX 2022 Sales Update since it was first presented by Myovant management in September 2022, the Special Committee and Goldman—now for the first time—discussed the possible impact of the Sept 15 ORGOVYX 2022 Sales Update on future years' sales, and Goldman reviewed a sensitivity

analysis regarding the potential impact of the Sept 15 ORGOVYX 2022 Sales Update on Myovant's valuation and overall projections. Even though neither Goldman nor the Special Committee had previously adjusted the Revised Projections in light of the Sept 15 ORGOVYX 2022 Sales Update, the Special Committee determined following discussion of the Sept 15 ORGOVYX 2022 Sales Update that it would be supportive of Sumitovant's and Sumitomo Pharma's latest proposal of $27.00 per share, and authorized Guinan to convey this message to Potter.

106.    Following the Special Committee meeting on October 23, 2022, Guinan contacted Potter and informed her that the Special Committee would support Sumitovant's and Sumitomo Pharma's latest proposal of $27.00 per share.

107.    Later in the day on October 23, 2022, the Special Committee met with Goldman, Skadden, and Conyers. At that meeting, Goldman delivered its Fairness Opinion to the Special Committee concluding that the $27.00 per share in cash that would be paid to the holders of Myovant common shares (other than Sumitovant and its affiliates) pursuant to the Merger was fair from a financial point of view to such holders. As per the Proxy, the Fairness Opinion opined that $27.00 per share was fair based on analyses showing that Myovant was purportedly worth between (i) $25.59 to $30.74 per share based on a DCF analysis, (ii) $25.34 to $36.39 per share based on the Biotech Premia Analysis, and (iii) $20.65 to $26.04 per share based on the $1B Txn Premia Analysis. But as noted above, the $1B Txn Premia Analysis was far less credible than the Biotech Premia Analysis because of the former's reliance on much older transactions outside the biotech industry.

108.    The $27.00 per share price to which the Special Committee agreed thus fell at the low end of the fairness range indicated by Goldman's most credible analyses: the DCF analysis

and the Biotech Premia Analysis.

109.    After obtaining the Fairness Opinion, the Special Committee unanimously determined that the Merger was fair to and in the best interests of Myovant and its shareholders (including the Minority Myovant Shareholders), and recommended that the Board approve the Merger. Among the factors cited in the Proxy supporting the Special Committee's recommendation was that "the Special Committee was advised by an *independent legal counsel* and an independent financial advisor in its review, evaluation and negotiation of the Merger." As noted above, however, Skadden was not independent because of the Skadden Conflicts (i.e., Skadden was unable to evaluate the Merger based solely on its merits without extraneous considerations or influences arising from its simultaneous representation of Sumitomo Banking and other Sumitomo Group entities). Thus, the statement above that Skadden was "independent" was also false.

110.    Following the conclusion of the Special Committee meeting on October 23, 2022, the Board met with Goldman, Skadden, and Conyers in attendance. Prior to the meeting, Sumitovant's representatives on the Board—Potter, Nishinaka and Gulfo—waived notice of the meeting and did not attend. At the meeting, the Board, based upon the Special Committee's recommendation, determined that the Merger was fair to and in the best interests of Myovant and its shareholders (including the Minority Myovant Shareholders), approved the Merger, and recommended that Myovant's shareholders vote in favor of the Merger.

111.    On October 23, 2022, Myovant and Sumitovant signed the Merger Agreement. The *same* individual—Monika Adams—signed the Merger Agreement on behalf of both Myovant and Sumitovant.

112.    Among other provisions, the Merger Agreement (i) barred Myovant from actively

soliciting competing acquisition proposals after the signing of the Merger Agreement, and (ii) obligated Myovant to pay Sumitovant a termination fee of $55,250,000 in connection with a termination of the Merger Agreement due to entry of Myovant into an alternative transaction. The Proxy acknowledged that the termination fee could "discourage the making of a competing acquisition proposal or adversely impact the price offered in such a proposal."

113.    The Merger also provided for the acceleration of all vested and unvested Myovant equity awards upon consummation of the Merger with the holders of such awards receiving $27.00 in cash for all shares covered by (i) vested and unvested options to purchase Myovant common shares (with an exercise price less than $27.00 per share), and (ii) unvested Time-Based Restricted Share Units ("RSUs") and Performance-Based Share Units ("PSUs") (with all performance goals under PSUs being deemed satisfied). As a result of such acceleration, and existing common stock holdings, Myovant's senior executives received a cash bonanza upon consummation of the Merger, as illustrated by the following table (based on tables in the Proxy purporting to illustrate the value of all equity awards and beneficial common stock ownership of Myovant's five most senior executive officers upon consummation of the Merger):

| Name | Title | Value of Common Shares | Value of Vested Stock Options | Valued of Unvested RSUs | Value of Unvested PSUs | Value of Vested Options | Total Value of Cash Payouts from Merger |
|---|---|---|---|---|---|---|---|
| David Marek | CEO | $2,583,225 | $1,820,542 | $8,691,948 | $3,633,309 | $5,267,266 | **$22,356,290** |
| Uneek Mehra | CFO | $559,548 | $266,886 | $4,913,244 | $2,999,997 | $587,157 | **$9,326,832** |
| Matthew Lang | General Counsel | $3,054,915 | $11,401,808 | $4,826,736 | $4,684,527 | $1,470,767 | **$25,438,753** |
| Juan Camilo Arjona | Chief Medical Officer | $2,338,254 | $7,462,283 | $4,322,214 | $2,799,981 | $1,281,954 | **$18,204,686** |

| Ferreira | | | | | | | |
|---|---|---|---|---|---|---|---|
| Lauren Merendino | Chief Commercial Officer | $588,357 | $491,960 | $3,989,169 | $2,799,981 | $632,536 | **$8,501,103** |

114. Based on compensation information provided in the annual proxy filed by Myovant on July 27, 2022 ("2022 Proxy"), these sums represented significant cash payouts for Marek, Mehra and Merendino as compared to their total compensation during 2021, which primarily consisted of equity awards that would have otherwise vested over periods of up to four years (instead of being paid out immediately upon consummation of the Merger):[17]

| Name | Title | 2021 Equity Award Compensation (subject to vesting periods of up to 4 years, and, in the case of PSUs, achievement of performance milestones) | 2021 Total Compensation | Merger Compensation |
|---|---|---|---|---|
| David Marek | CEO | $4,817,360 | $6,247,509 | **$22,356,290** |
| Uneek Mehra | CFO | $4,533,511 | $5,164,872 | **$9,326,832** |
| Lauren Merendino | Chief Commercial Officer | $2,825,531 | $3,463,677 | **$8,501,103** |

115. The above table leaves little doubt that when the Special Committee called Marek and Mr. Mehra into the October 23, 2022, meeting to review and discuss the Sept 15 ORGOVYX

---

[17] The 2022 Proxy did not provide compensation information for Lang and Juan Camilo Arjona Ferreira ("Ferreira"). But since the compensation information in the 2022 Proxy was limited to Myovant's CEO, and two other most highly compensated executive officers in 2021, the excess of the cash payouts from the Merger over 2021 compensation was even greater for Lang and Ferreira (whose compensation in 2021 would have been lower than Mehra and Merendino).

2022 Sales Update, both Marek and Mehra were highly motivated to skew their advice towards accepting $27.00 per share rather than keeping Myovant independent.

116.    On October 23, 2022, after signing the Merger Agreement and other relevant transaction documents, Myovant, Myovant U.S., Sumitovant and Sumitomo Pharma jointly announced the Merger. The source of the press release announcing the Merger was Myovant U.S. and Sumitovant.

117.    On January 23, 2023, Defendants filed the false and misleading Proxy. The Proxy disclosed the Initial Projections and the Revised Projections. The Revised Projections included in the Proxy matched the Revised Projections appearing in all of Goldman's presentations to the Special Committee from August 3, 2022, through October 23, 2022, with two exceptions—the Revised Projections in the Proxy estimated sales for 2022 at $242 million and for 2023 at $599 million, while the Revised Projections in Goldman's final presentations had estimated sales for 2022 at $274 million, and for 2023 at $597 million. However, the valuation ranges in the Proxy matched the valuation ranges in all of Goldman's presentations to the Special Committee in October 2022.

118.    The Proxy stated that the projections included in the Proxy were "in the view of Myovant management . . . reasonably prepared in good faith on a basis reflecting the best available estimates and judgments at the time of preparation . . ."

119.    On March 1, 2023, a majority of Minority Myovant Shareholders voted to approve the Merger.

120.    On March 10, 2023, the Merger closed, and Myovant became a wholly owned subsidiary of Sumitovant.

121.    Marek has remained continuously employed by Myovant after the closing of the

Merger.

**Appraisal Rights Under Bermuda Law**

122.    The Proxy explained that Myovant shareholders who did not vote in favor of the

Merger had appraisal rights under Bermuda law:

> Under Bermuda law, in the event of a merger of a Bermuda company with another
> Bermuda company or foreign corporation, any shareholder of the Bermuda
> company is entitled to receive fair value for its shares. For purposes of Section
> 106(2)(b)(i) of the Bermuda Companies Act, the Myovant Board considers the fair
> value for each Myovant common share to be $27.00, without interest and less any
> applicable withholding taxes.

> Any shareholder of Myovant who is not satisfied that it has been offered fair value
> for its shares *and whose shares are not voted in favor of the Merger Proposal* may
> exercise its appraisal rights under the Bermuda Companies Act to have the fair
> value of its shares appraised by the Supreme Court of Bermuda. Persons owning
> beneficial interests in shares but who are not shareholders of record should note
> that only persons who are shareholders of record are entitled to make an application
> for appraisal. Any shareholder of Myovant intending to exercise appraisal rights
> must file its application for appraisal of the fair value of its shares with the Supreme
> Court of Bermuda within one month after the date the notice convening the special
> general meeting to approve the Merger has been given. The notice delivered with
> this proxy statement constitutes this notice. There are no statutory rules, and there
> are limited decisions of the Supreme Court of Bermuda that prescribe in detail the
> operation of the provisions of Section 106 of the Bermuda Companies Act or the
> process of appraisal by the Supreme Court of Bermuda; the Supreme Court of
> Bermuda retains considerable discretion as to the precise methodology that it would
> adopt when determining the fair value of shares in an appraisal application under
> the Bermuda Companies Act.

> *If a shareholder of Myovant votes in favor of the Merger Proposal at the special
> general meeting, such shareholder will have no right to apply to the Supreme
> Court of Bermuda to appraise the fair value of its shares, and instead, if the
> Merger is consummated . . . each Myovant common share of such shareholder
> will be cancelled and will have the right to receive the per share merger
> consideration*. Voting against the Merger, or not voting, will not in itself satisfy the
> requirements for notice and exercise of a shareholder's right to apply for appraisal
> of the fair value of its shares.

123.    By misleading Minority Myovant Shareholders, the material misrepresentations

and omissions in the Proxy caused Minority Myovant Shareholders who voted for the Merger to

lose their appraisal rights under Bermuda law.

**The Proxy Contains Material Misrepresentations and Omissions**

124.    Proxies seeking shareholder action must disclose conflicts affecting the law firm advising the target company that might be perceived to have affected the advocacy of such law firm on behalf of the target company. Such disclosure is required so that selling shareholders have an opportunity to examine a transaction more critically and to judge for themselves what significance to attribute to such conflicts. The relevant inquiry is not whether an actual conflict of interest existed, but rather whether *full disclosure* of potential conflicts of interest has been made.

125.    When a special committee has been formed to negotiate a transaction with a controlling stockholder, it is vital that the law firm retained to represent the special committee does not suffer from any potential conflicts that might compromise the law firm's loyalty to the special committee and independence from the controlling stockholder. That is because, when advising a special committee on a transaction with a controlling stockholder, the law firm plays a critical role in terms of presenting options and making recommendations to the special committee. Additionally, if specifically retained because of its experience and expertise (as Skadden was here), the law firm can strongly influence the choices and decision making of the special committee's members with respect to the transaction.

126.    Thus, in any  transaction with a controlling stockholder, it would be important for selling shareholders to know if the special committee's law firm simultaneously has a *concurrent* relationship with an affiliate providing financing to the controlling stockholder, since such a relationship gives the law firm an incentive to provide advice to the special committee skewed towards consummating a deal with the controlling stockholder even at a suboptimal price instead

of soliciting competing bids from other potential counterparties with different financing sources unaffiliated with the controlling stockholder.

127.    Additionally, it would be important for selling shareholders to know if the special committee's law firm had concurrent and recent past relationships with companies affiliated with the controlling stockholder since such relationships could plausibly cause the law firm to skew its advice to the special committee with a view towards maintaining and generating future work from those relationships. Concurrent and recent past relationships between the special committee's law firm and companies affiliated with the controlling stockholder would give the law firm a powerful incentive to maintain good will and not be too aggressive during the negotiations with the controlling stockholder to maintain and generate future work from such relationships.

128.    Here, the Proxy acknowledges that it was essential that the advisors representing the Special Committee not harbor any potential conflicts that could compromise their loyalty to the Special Committee and independence from Sumitovant, Sumitomo Pharma and Sumitomo Chemical. To that end, when discussing the retention of Goldman, Cooley and Conyers, the Proxy states that the Special Committee confirmed that such advisors "were not disqualified from being engaged by the Special Committee by virtue of any *potential conflicts of interest* with respect to a potential transaction with Sumitovant and [Sumitomo Pharma]." Thereafter, when discussing the Special Committee's retention of Skadden, the Proxy states that the Special Committee "determined to retain Skadden to serve as counsel to the Special Committee, based on, among other things, Skadden's qualifications, experience and reputation and *the absence of conflicts on the part of Skadden*." Yet, despite their awareness of the materiality of potential conflicts affecting advisors to the Special Committee, Defendants failed to disclose the Skadden Conflicts.

129.    The Skadden Conflicts rendered at least two statements in the Proxy false and misleading. *First*, the statement in the Proxy that Skadden did not have any conflicts was obviously false precisely because Skadden had conflicts, as detailed above. *Second*, the Proxy stated, under a bulleted list of procedural safeguards purportedly implemented "to ensure the fairness of the Merger," that the Special Committee recommended the Merger because "the Special Committee was advised by an *independent legal counsel* . . . in its review, evaluation and negotiation of the Merger." This statement was also false because Skadden was not "independent" due to the Skadden Conflicts, as detailed above.

130.    Reasonable Minority Myovant Shareholders would have considered disclosure of the Skadden Conflicts as significantly altering the total mix of information made available to them since such conflicts could have skewed Skadden's advice to the Special Committee towards consummating a deal with Sumitovant even at a suboptimal price for Minority Myovant Shareholders and *against* soliciting competing bids (i.e., to avoid causing Sumitomo Banking to lose the opportunity to provide $1.7 billion in financing to close the Merger, and avoid affecting future business from Sumitomo Nikko, Sumitomo Trust, and other members of the Sumitomo Group *keiretsu* by not causing Sumitomo Pharma and Sumitomo Chemical to lose the opportunity to acquire Myovant).

131.    Moreover, the Skadden Conflicts caused a loss in value to Minority Myovant Shareholders given that (i) while harboring an incentive to discourage solicitation of competing bids (because of the Skadden Conflicts), Skadden participated in discussions on August 22, 2022, and October 1, 2022, that led the Special Committee to decline to solicit competing bids, (ii) soliciting competing bids from other potential counterparties (including actively engaging with Company A after it expressed interest) would have greatly increased the Special Committee's

negotiating leverage and helped it secure a higher price from Sumitovant, (iii) Sumitovant would have been prepared to pay as high as $29.50 per share for Myovant based on the valuation analyses of J.P. Morgan (and perhaps even higher had it been given access to the Revised Projections), but had no incentive to do so in the absence of any competing bids, and (iv) $27.00 per share was at the low end of the fairness range determined by Goldman under its most credible valuation analyses.

## CLASS ACTION ALLEGATIONS

132.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class ("Class") consisting of all individuals and entities that were Myovant common shareholders of record as of the close of business on January 20, 2023 ("Class Period"), which was the record date for determining the Minority Myovant Shareholders entitled to vote on the Merger. Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest, as well as Sumitovant, Sumitomo Pharma and Sumitomo Chemical and their affiliates.

133.    Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

134.    The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, the Proxy discloses that 97,098,846 Myovant common shares were issued and outstanding as of January 17, 2023 (of which approximately 51.5% was owned by Sumitovant as of such date). All members of the Class may be identified from records maintained by Myovant or

its transfer agent and may be notified of the pendency of this action by mail, using forms of notice like that customarily used in securities class actions.

135.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws specified above.

136.    Plaintiff will fairly and adequately protect the interests of the Class, and has no interests antagonistic to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in securities class action litigation of this nature.

137.    Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*: (i) whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder; (ii) whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and (iii) whether Plaintiff and the other members of the Class are entitled to damages, and in what amount.

138.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

139.    Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## CLAIMS FOR RELIEF

## COUNT I

**Against All Defendants**
**for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

140.    Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

141.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any Proxy, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

142.    As detailed above, Defendants disseminated a false and misleading Proxy that made false and misleading statements, and failed to disclose material facts necessary to make statements made therein, considering the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

143.    By virtue of their positions within the Company, and/or roles in the process of preparing, reviewing, and/or disseminating the Proxy, the Individual Defendants were aware of their duty not to make false and misleading statements in the Proxy, and not to omit material facts from the Proxy necessary to make statements made therein—considering the circumstances under which they were made—not misleading.

144.    Yet, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, Defendants (i) made untrue statements of material fact in the Proxy, and/or (ii) omitted material facts from the

Proxy necessary to make statements therein—considering the circumstances under which they were made—not misleading, in order to induce Myovant stockholders to vote in favor of the Merger. In particular, the Proxy prepared and approved by Defendants stated that Skadden had no conflicts and was independent, which statements were false because of the Skadden Conflicts.

145.    Defendants were at least negligent in filing the Proxy with these material misrepresentations and omissions.

146.    The material misrepresentations and omissions in the Proxy were material insofar as there is a substantial likelihood that reasonable Minority Myovant Shareholders would have viewed disclosure of the Skadden Conflicts as significantly altering the "total mix" of information made available to Minority Myovant Shareholders. In other words, the alleged omissions were not so obviously unimportant to a reasonable Minority Myovant Shareholders that reasonable minds could not differ on the question of their importance

147.    Since, according to the Proxy, Sumitovant could not have consummated the Merger absent the approval of a majority of the Minority Myovant Shareholders, the Proxy soliciting the votes of Minority Myovant Shareholders was an essential link in the accomplishment of the Merger. Thus, transaction causation is established.

148.    If the Special Committee had exercised its power to reach out to other potential counterparties with an interest in acquiring Myovant (including seriously engaging with Company A), it could have secured other bids, dramatically increased its negotiating leverage, and secured a higher price from Sumitovant or a competing bidder. Based on the valuations of Myovant conducted by J.P. Morgan, Sumitovant would have been willing to pay as high as $29.50 per share for Myovant (and even more had it been granted access to the Revised Projections). Instead, after discussions concerning whether to solicit competing bids (in which Skadden participated despite

harboring an incentive to discourage solicitation of competing bids), the Special Committee adopted a controlled mindset pursuant to which it declined to solicit competing bids from other potential counterparties (including failing to engage seriously with Company A). This decision, reached after discussions in which a conflicted Skadden participated, deprived the Special Committee of negotiating leverage it could have used to secure a higher price from Sumitovant. As a result, Minority Myovant Shareholders did not receive fair value for their shares, and the undisclosed Skadden Conflicts caused a loss in value to Minority Myovant Shareholders. Loss causation is thus established.

## COUNT II

### Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act

149.    Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein

150.    The Individual Defendants acted as controlling persons of Myovant within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their positions as officers and/or directors of Myovant, and participation in, and/or awareness of Myovant's operations, and/or intimate knowledge of the contents of the Proxy filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Myovant with respect to the Proxy, including the content and dissemination of the various statements in the Proxy that Plaintiff contends are materially false and misleading, and the omissions of material fact specified above.

151.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the

statements or cause the statements to be corrected.

152.    Each of the Individual Defendants had direct and supervisory involvement in the negotiation of the Merger, and, therefore, is presumed to have had the power to control or influence the transactions giving rise to the securities violations alleged herein, and exercised same. In particular, the Proxy at issue references the unanimous recommendation of the Special Committee (and thereafter the Board, based on the Special Committee's recommendation) to approve the Merger, and recommend that Myovant stockholders vote for the Merger.

153.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered in connection with such negotiation, review, and approval.

154.    By virtue of the foregoing, the Individual Defendants had the ability to exercise control over and did control a person or persons who violated Section 14(a), by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.    Preliminarily determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure; appointing Plaintiff as the Class Plaintiff; and appointing Lead Counsel as Class Counsel;

B.    Rescinding the Merger Agreement and the transactions consummated thereby, or in the alternative, granting Plaintiff and other Class Members rescissory damages against all Defendants, jointly and severally, in an amount to be proven at trial;

C.    Directing Defendants to account to Plaintiff and other Class Members for all damages suffered as a result of their misconduct, jointly and severally, in an amount to be proven at trial;

D.    Awarding Plaintiff and other Class Members pre- and post-judgment interest on any damages recovered;

E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees and expenses; and

F.    Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: October 17, 2023

**WOHL & FRUCHTER LLP**

By: */s/ Joshua E. Fruchter*

Joshua E. Fruchter (JF2970)
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Tel: (845) 290-6818
Fax: (718) 504-3773
Email: jfruchter@wohlfruchter.com

**WEISS LAW**

Joshua M. Rubin
305 Broadway, 7th Floor
New York, NY 10007
Tel: (212) 682-3025
Fax: (212) 682-3010
Email: jrubin@weisslawllp.com

Michael A. Rogovin
476 Hardendorf Ave. NE
Atlanta, Georgia 30307
Tel: (404) 692-7910
Fax: (212) 682-3010
Email: mrogovin@weisslawllp.com

*Lead Counsel for the Proposed Class*