**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JOSEPH ZAPPIA, Individually and on Behalf
of All Others Similarly Situated,

                           Plaintiff,

                -v.-

MYOVANT SCIENCES LTD.,
MYOVANT SCIENCES INC.,
SUMITOMO PHARMA AMERICA, INC.,
TERRIE CURRAN, MARK GUINAN,
DAVID MAREK, NANCY VALENTE,
and MATTHEW LANG,

                       Defendants.

Case No.: 1:23-cv-08097-JSR

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

                                    FRESHFIELDS BRUCKHAUS
                                    DERINGER US LLP

                                    *Counsel for Defendants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT ........................................................................ 1

BACKGROUND ............................................................................................... 3

      A.    Myovant and the Other Defendants ............................................. 3

      B.    Sumitovant ................................................................................... 4

      C.    Myovant Forms the Special Committee ....................................... 4

      D.    The Special Committee Retains Independent Financial and
           Legal Advisors ............................................................................ 5

      E.    The Special Committee Negotiates the Merger ........................... 6

           1.    Proposals from Sumitovant and SMP ............................ 6

           2.    Proposals from Third Parties .......................................... 8

      F.    The Proxy Statement .................................................................... 9

      G.    Plaintiff's Counsel Challenge the Preliminary Proxy ............... 10

      H.    Plaintiff's Firms Try Again, Filing This Complaint ................... 11

LEGAL STANDARD ...................................................................................... 12

ARGUMENT .................................................................................................. 12

    I.    The Complaint Fails to State a Section 14 Claim ................................. 12

      A.    Plaintiff Cannot Assert a Fiduciary Duty Claim Disguised
           as a Section 14 Claim ................................................................ 12

      B.    None of the Allegedly Omitted Facts Is Material ..................... 14

      C.    None of the Challenged Statements Is False .............................. 16

           1.    The Challenged Statements Are Inactionable Opinions .............. 16

           2.    The Challenged Statements Are Not Adequately Alleged to
               be False  Even if Considered to be Statements of Fact ................ 19

               i.    Skadden's Other Clients Not "Directly
                    Adverse" to the Special Committee ................................. 20

               ii.    No Significant Risk of a Material Limitation ................... 20

**Page**

   D. Plaintiff Fails to Allege Negligence.................................................... 23

 II. The Complaint Fails to State a Section 20 Claim .................................. 24

CONCLUSION............................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Akagi v. Turin Hous. Dev. Fund Co.*,
   2017 WL 1076345 (S.D.N.Y. Mar. 22, 2017) ........................................................20

*In re Alstom SA*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005)....................................................................25

*Arkansas Pub. Emps. Ret. Sys. v. Bristol Myers Squibb Co.*,
   28 F.4th 343 (2d Cir. 2022) ...................................................................................19

*Ashcroft v. Iqbal*,
   556 U.S. 678 (2009)................................................................................................24

*Assad v. Botha*,
   2023 WL 7121419 (Del. Ch. Oct. 30, 2023) ..........................................................15

*Bisel v. Acasti Pharma, Inc.*,
   2022 WL 4538173 (S.D.N.Y. Sept. 28, 2022).........................................................12

*Bond Opportunity Fund v. Unilab Corp.*,
   2003 WL 21058251 (S.D.N.Y. May 9, 2003) ............................................12, 23, 24

*Bond Opportunity Fund v. Unilab Corp.*,
   87 F. App'x 772 (2d Cir. 2004) .................................................................12, 21, 23

*Brooklyn Navy Yard Congregation Partners, L.P. v. PMNC*,
   663 N.Y.S.2d 499 (Sup. Ct. 1997).................................................................22–23

*Callanan v. Powers*,
   92 N.E. 747 (N.Y. 1910) .........................................................................................24

*Canfield v. Reynolds*,
   631 F.2d 169 (2d Cir. 1980).....................................................................................24

*Das v. Rio Tinto PLC*,
   332 F. Supp. 3d 786 (S.D.N.Y. 2018)......................................................................25

*First NBC Bank v. Murex, LLC*,
   259 F. Supp.3d 38 (S.D.N.Y. 2017).........................................................................20

*Fogel v. Wal-Mart de México SAB de CV*,
   2017 WL 751155 (S.D.N.Y. Feb. 27, 2017)............................................................25

*Furlong Fund LLC v. VBI Vaccines, Inc.*,
   2016 WL 1181710 (S.D.N.Y. Mar. 25, 2016) ............................................12, 14, 23

iii

**Cases**                                                                                                              **Page(s)**

*Garber v. Legg Mason, Inc.*,
    347 F. App'x 665 (2d Cir. 2009) ...................................................................................15–16

*Gray v. Wesco Aircraft Holdings, Inc.*,
    454 F. Supp. 3d 366 (S.D.N.Y. 2020)..........................................................................17

*GSI Com. Sols., Inc. v. BabyCenter, L.L.C.*,
    618 F.3d 204 (2d Cir. 2010)...........................................................................18, 20, 23

*In re Bemis Co. Sec. Litig.*,
    512 F. Supp. 3d 518 (S.D.N.Y. 2021) ..........................................................................23

*In re Columbia Pipeline*,
    405 F. Supp. 3d 494 (S.D.N.Y. 2019)..................................................................13, 24–25

*In re Keryx Biopharmaceuticals, Inc. Sec. Litig.*,
    2014 WL 585658 (S.D.N.Y. Feb. 14, 2014) ..................................................................19

*In re Lehman Bros. Sec. & ERISA Litig.*,
    2013 WL 5730020 (S.D.N.Y. Oct. 22, 2013) ................................................................17

*In re Merrill Lynch & Co., Inc. Rsch. Rep. Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003)...........................................................................16

*In re Micromet, Inc. S'holder Litig.*,
    2012 WL 681785 (Del. Ch. Feb. 29, 2012) ..................................................................15

*In re Mindbody, Inc. Sec. Litig.*,
    489 F. Supp. 3d 188 (S.D.N.Y. 2020)...........................................................................14

*In re Pfizer Inc. v. S'holder Derivative Litig.*,
    722 F. Supp. 2d 453 (S.D.N.Y. 2010)...........................................................................14

*In re Sotheby's Holdings, Inc.*,
    2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ..............................................................25

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)...........................................................................25

*In re Time Warner Inc. Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993)............................................................................................16

*In re Trulia, Inc. Stockholder Litig.*,
    129 A.3d 884 (Del. Ch. 2016)......................................................................................11

**Cases**                                                                  **Page(s)**

*Kas v. Financial General Bankshares*,
    796 F.2d 508 (D.C. Cir. 1986) ...................................................................13

*Kennecott Copper Corp. v. Curtiss-Wright Corp.*,
    584 F.2d 1195 (2d Cir. 1978) ...................................................................16

*Kleinman v. Elan Corp., plc*,
    706 F.3d 145 (2d Cir. 2013) .....................................................................19

*Koppel v. 4987 Corp.*,
    167 F.3d 125 (2d Cir. 1999) ...........................................................13, 14, 15

*Lanigan Grp., Inc. v. Li-Cycle Holdings Corp.*,
    2023 WL 6541884 (E.D.N.Y. Oct. 6, 2023) ............................................14

*Murphy v. Int'l Bus. Machines Corp.*,
    2012 WL 566091 (S.D.N.Y. Feb. 21, 2012) ..............................................3

*Olkey v. Hyperion 1999 Term Tr., Inc.*,
    98 F.3d 2 (2d Cir. 1996) ...........................................................................12

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ..............................................................16, 17, 18, 19

*Panter v. Marshall Field & Co.*,
    646 F.2d 271 (7th Cir. 1981) ...................................................................13

*Resnik v. Swartz*,
    303 F.3d 147 (2d Cir. 2002) .....................................................................16

*Schmitt v. China XD Plastics Co., Ltd.*,
    2023 WL 6385763 (E.D.N.Y. Sept. 29, 2023) .........................................16

*Schwab v. E*TRADE Fin. Corp.*,
    752 F. App'x 56 (2d Cir. 2018) ...............................................................17

*Six W. Retail Acq., Inc. v. Sony Theatre Mgmt. Corp.*,
    2003 WL 282187 (S.D.N.Y. Feb. 7, 2003) ..............................................23

*Tiberius Cap., LLC v. PetroSearch Energy Corp.*,
    2011 WL 1334839 (S.D.N.Y. Mar. 31, 2011) .........................................25

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016) ............................................................3, 17, 18

**Cases**                                                                    **Page(s)**

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)....................................................................17

*Whiting Corp. v. White Mach. Corp.*,
    567 F.2d 713 (7th Cir. 1977) ............................................................22

**Statutes**

15 U.S.C. § 78n(a) ............................................................................ *passim*

15 U.S.C. § 78t(a) ..............................................................1, 10, 24, 25

15 U.S.C. § 78u-4(b)(1)(B)............................................................ *passim*

17 C.F.R. § 240.14a-9......................................................................14, 25

Fed. R. Civ. Pro. 8.................................................................................1

Fed. R. Civ. Pro. 12(b)(6) ...................................................................1

**Other Authorities**

ABA Comm. on Ethics & Pro. Resp., Formal Op. 95-390 (1995) ...............................22

Model Rules of Pro. Conduct r. 1.7 (Am. Bar Ass'n 2023) ............................20, 21, 23

Complaint, *Halberstam v. Myovant Sciences Ltd.*,
    No. 22-cv-10788 (S.D.N.Y. Mar. 8, 2023) ...............................................10

Notice of Voluntary Dismissal, *Halberstam v. Myovant Sciences Ltd.*,
    No. 22-cv-10788 (S.D.N.Y. Mar. 8, 2023) ...............................................10

Notice of Voluntary Dismissal, *Schiffenbauer v. Myovant Sciences Ltd.*,
    No. 22-cv-10467 (S.D.N.Y. Mar. 7, 2023) ...............................................10

Defendants respectfully submit this Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint pursuant to Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "Reform Act").[1]

## PRELIMINARY STATEMENT

Plaintiff, owner of 65 shares (approximately valued at $2,000) of Myovant Sciences Ltd. ("Myovant") stock, brings this action under Sections 14(a) and 20(a) of the Exchange Act of 1934 to unwind a $1.7 billion dollar transaction through which Sumitovant Biopharma Ltd. ("Sumitovant") took Myovant private. The Plaintiff is not alleged to have voted against the transaction, which closed seven months ago. Now, months later, apparently unhappy with the price he received—and second-guessing the deal struck by the special committee of Myovant's Board of Directors (the "Special Committee") that negotiated the transaction—Plaintiff files this lawsuit. Unable or unwilling to bring his claim in Bermuda, whose laws govern any alleged breach of fiduciary duty claim but whose courts would require him to pay Defendants' costs if he lost, Plaintiff has conjured an unfounded disclosure claim seeking relief to which he is not entitled.

Plaintiff's claim also appears to be a paradigmatic example of lawyer-driven litigation. This is not the first lawsuit that Plaintiff's counsel has filed against Myovant. Last year, the same firms sued Myovant on behalf of different clients, seeking changes to Myovant's preliminary proxy statement. Sometime later, these firms voluntarily withdrew their complaints and demanded payment of a mootness fee. Myovant declined. Plaintiff's counsel then commenced the instant action. The federal securities laws set a high pleading bar to discourage such meritless and opportunistic lawsuits. This lawyer-driven lawsuit fails to clear that hurdle.

---

[1]   The term "Complaint" refers to the Amended Complaint, ECF No. 19. Citations to "¶ __" are to paragraphs in the Complaint. Unless otherwise indicated, all internal quotation marks and citations have been omitted and all emphasis has been added.

After spending months reviewing the 259-page definitive proxy ("Proxy," Hadjimichael Decl., Ex. C), Plaintiff identifies only two alleged misstatements. These statements do not concern Myovant's financial performance. They do not concern the valuations underlying the transaction. Nor do they concern the independence of the financial advisor guiding negotiations with Sumitovant or a third party. Plaintiff concedes the Proxy accurately and fully disclosed each of these key issues.

The only statements Plaintiff identifies concern alleged conflicts of the Special Committee's legal counsel at Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"). Specifically, Plaintiff points to a handful of publicly disclosed, unrelated transactions on which Skadden advised to argue that Skadden was conflicted. *None* of these transactions involved Skadden representing the purchaser, Sumitovant. *None* involved Skadden representing anyone but the Special Committee in connection with the merger. Rather, each involved Skadden advising legally distinct entities, Sumitomo Mitsui Banking Corporation ("SMBC"), SMBC Nikko Securities Inc., Sumitomo Mitsui Trust Bank, Ltd. (the "Sumitomo Trust"), or Sumitomo Life Insurance Co. ("Sumitomo Life")—on matters ***unrelated*** to the Sumitovant–Myovant transaction. None of this—as a matter of law—renders Skadden conflicted. Plaintiff alleges no specific misconduct on Skadden's part and offers no well-pleaded facts showing that anything Skadden did affected the merger price. That dooms Plaintiff's claim, a result that does not change because some entities with "Sumitomo" in their name had small indirect equity interests in Sumitovant's publicly traded corporate parent. Plaintiff's claim also fails because he does not allege that the Special Committee failed to vet Skadden, or any bases from which one could infer that the Special Committee knew (or should have known) about Skadden's "conflict" even if one accepts (and one should not) that Skadden was conflicted.

Ultimately, the Complaint fails as a matter of law for several independent reasons. *First*, Plaintiff filed the wrong lawsuit in the wrong court. Plaintiff's Complaint attempts to second-guess

the Special Committee's sound business judgment on a now-consummated deal.  Preferring not to litigate in Bermuda (under whose laws Myovant was organized), Plaintiff tries to shoehorn fiduciary duty allegations into a Section 14(a) claim.  This Circuit has long recognized that no such claim lies.

*Second*, the Complaint fails because the purportedly "omitted" facts about Skadden's unrelated representations are publicly available.  Plaintiff, and all other market participants, had access to this information, and Myovant was under no duty, as a matter of law, to republish it.

*Third*, neither challenged statement is a misstatement or omission of fact, let alone a material fact.  The Complaint's gravamen is that the Special Committee formed a view that Skadden was not conflicted and engaged it as legal counsel.  But the Complaint fails to plead with sufficient particularly any facts to support the inference that the Special Committee did not actually believe Skadden to be independent, or that it lacked a basis for that opinion.  In fact, the Complaint lacks any facts that would support the inference that Skadden was conflicted.

*Finally*, merely concluding that Defendants were "at least negligent" in greenlighting the Proxy is exactly the kind of handwaving that the Reform Act is meant to weed out.  A claim brought under Section 14—unlike a claim under Section 11—is not grounded in strict liability, and Plaintiff pleads neither a deficiency in the Special Committee's conflict-assessment process nor how any Defendant acted negligently.  This Complaint should be dismissed.

## BACKGROUND[2]

### A.    Myovant and the Other Defendants

Founded in 2016, Myovant was a publicly traded biopharmaceutical company that developed

---

[2]    This section relies on (1) the allegations in the Complaint, which are accepted as true solely for the purposes of this motion, (2) documents referenced therein, and (3) documents that may be judicially noticed.  *See Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Murphy v. Int'l Bus. Machines Corp.*, 2012 WL 566091, at *9 n.4 (S.D.N.Y. Feb. 21, 2012).

and commercialized drugs. ¶¶ 2, 45; Proxy 2, 85. As of 2019, Sumitovant owned approximately

52% of Myovant's common shares. ¶¶ 4, 35, 52. In October 2022, Sumitovant agreed to acquire

Myovant's remaining outstanding stock through a take-private merger that closed on March 10,

2023. ¶¶ 3, 41; Proxy 33–34. As a result of the merger, which Plaintiff is not alleged to have

opposed, Myovant became a wholly owned subsidiary of Sumitovant. ¶ 120; Proxy 3. On June 13,

2023, Myovant merged with and into Sumitovant[3] and ceased to exist. In July 2023, Myovant's U.S.

subsidiary Myovant Sciences, Inc. merged with and into Sumitomo Pharma America, Inc.[4] *See id.*

**B.    Sumitovant**

At all relevant times, Sumitovant was a biopharmaceutical company incorporated in

Bermuda and owned by Sumitomo Pharma Co., Ltd. ("SMP"). ¶ 35. Sumitomo Chemical Co.

Ltd. ("Sumitomo Chemical") owns 51.76% of SMP, with the rest being publicly traded on the

Tokyo Stock Exchange. ¶¶ 4, 37–38. Sumitomo Chemical is itself publicly traded on the Tokyo

Stock Exchange, with Sumitomo Life, Sumitomo Trust, and SMBC owning minor stakes. ¶ 38.

There is no allegation in the Complaint that Sumitomo Chemical, or any other company identified

by Plaintiff in Paragraph 38 of the Complaint, has representatives on Sumitovant's board or

otherwise exercises any control over Sumitovant.

**C.    Myovant Forms the Special Committee**

As disclosed in the Proxy, the merger at the heart of this case was the culmination of the

Myovant Board's exercise of its fiduciary duties to "regularly review[] and assess[] strategic

opportunities" "with a view towards enhancing shareholder value." Proxy 24.

On April 4, 2022, Sumitovant and SMP informed Myovant's Board of their potential interest

in acquiring all Myovant shares Sumitovant did not already own. ¶ 42; Proxy 24. On April 28,

---

[3]    Later renamed Sumitomo Pharma UK Holdings, Ltd.

[4]    Formerly known as Sunovion Pharmaceuticals Inc.

2022, Myovant's Board formed the Special Committee, comprised of three independent directors (Mark Guinan, Terrie Curran, and Nancy Valente), to: (1) "review and evaluate any proposal from Sumitovant," (2) "develop and negotiate the terms and make a recommendation to the full Myovant Board regarding" a potential transaction, (3) "identify, review and evaluate available alternatives to a potential transaction with Sumitovant," and (4) "recommend to the Myovant Board what further actions, if any, should be taken." ¶¶ 43, 54; Proxy 25.

**D.    The Special Committee Retains Independent Financial and Legal Advisors**

Evidencing its commitment to maximizing value for Myovant's shareholders, the Special Committee approved the engagement of independent and experienced financial and legal advisors on April 28, 2022.  Specifically, the Special Committee retained Goldman Sachs & Co. LLC ("Goldman") as its financial advisor, Cooley LLP as its U.S. counsel, and Conyers Dill and Pearman Limited as its Bermuda counsel.  ¶ 44; Proxy 25–26.  The Special Committee did not merely rubber stamp these professional engagements; as the Proxy makes clear, the Special Committee reviewed "proposed forms of engagement letters," as well as "disclosures regarding any potential conflicts of interest such advisors may have with respect to a potential transaction involving Sumitovant."  Proxy 25; *see* ¶ 55.[5]  This process was robust, and the Complaint does not allege otherwise.

On June 28, 2022, the Special Committee added Skadden to its roster of advisors, "based on, among other things," (1) "Skadden's qualifications, experience and reputation in" take-private transactions, and (2) "the absence of conflicts on the part of Skadden."  Proxy 26; *see* ¶ 57.  The Complaint is devoid of a single allegation that the Special Committee's process for vetting and retaining Skadden was any less robust than it was for the Special Committee's other advisors.

---

[5]    For example, the Special Committee made a "determination, based on disclosures provided by Goldman Sachs . . . with respect to any material relationships with either Sumitovant or SMP, that Goldman Sachs did not have any material conflicts."  Proxy 26; *see* ¶ 55.

E.    **The Special Committee Negotiates the Merger**

Plaintiff's core complaint is that the Special Committee failed to obtain a sufficiently high price for Myovant based on Goldman's valuation materials attached to the Proxy.  ¶¶ 19, 71, 75–76, 87, 131.  Plaintiff argues that his analysis of Goldman's materials suggest that a higher price could be had under various valuation methodologies, but that the Special Committee failed to obtain that price.  ¶¶ 76, 81–82, 86, 98, 117.  That is a selective reading of history, to say the least.

As detailed in the Proxy, between September 30, 2022 and October 23, 2022, Myovant received *five* proposals from Sumitovant and SMP and engaged in extensive negotiations to maximize the value to Myovant's shareholders.  Proxy 28–33.  Investors reviewing the Proxy were provided with detailed and thorough disclosures regarding the Board meetings, Special Committee meetings, videoconferences, phone calls, and oral conversations regarding the proposals, as well as financial analyses and other information connected to the potential transaction.  *See* Proxy 24–59.  The Special Committee succeeded at increasing the transaction price from $22.75 to $27.00, or nearly 20%, which ultimately was ***more than a 50.3% premium*** to Myovant's pre-transaction trading price.  Proxy 32–33.  The Special Committee did its job, and it did it well.

1.    **Proposals from Sumitovant and SMP**

Before Sumitovant's offer became public, Myovant's stock was trading below $18.00 per share (the "Undisturbed Share Price").  Proxy 51–52.  On September 30, 2022, Sumitovant submitted a non-binding proposal to acquire all Myovant common shares it did not already own for $22.75 per share.  ¶ 84; Proxy 28.  This was a 26.7% premium over the Undisturbed Share Price.  ¶ 84; Proxy 28.  The Special Committee met with Goldman to discuss Sumitovant's proposal and found it lacking.  ¶ 85; Proxy 28–29.  The Special Committee thus instructed Goldman (not Skadden) to communicate to Sumitovant's advisors that the proposal "significantly undervalued Myovant."  ¶ 85; Proxy 29.  Shortly thereafter, the Special Committee communicated

to Sumitovant that it sought value near to $30.00 per share.  ¶ 92; Proxy 30.

Following weeks of discussion, Sumitovant and SMP increased their offer to $25.25 per share.  ¶ 97; Proxy 31.  This represented a 40.6% premium over the Undisturbed Share Price.  ¶ 98; Proxy 31.  On October 21, 2022, Sumitovant and SMP increased their offer to $26.25 per share, reflecting a 46.2% premium over the Undisturbed Share Price.  ¶ 98; Proxy 32.  The Special Committee again met with its advisors and authorized Goldman to inform Sumitovant's advisors that the increased price was still insufficient.  Proxy 32.

The next day, Sumitovant tried again.  Myrtle Potter, Sumitovant's CEO, called Mr. Guinan, the chair of the Special Committee, and offered $26.75 for the remaining shares of Myovant.  ¶ 100; Proxy 32.  Mr. Guinan rejected this offer and informed Ms. Potter that the Special Committee was unlikely to support the proposed transaction at this price.  ¶ 100; Proxy 32.  In response, Ms. Potter again increased the proposed price to $27.00 per share, stating that this was Sumitovant's best and final offer.  ¶ 100; Proxy 32.

The Special Committee then met with its advisors to discuss Sumitovant's increased offer, which was now *50.3%* higher than Myovant's Undisturbed Share Price.  Yet, the Special Committee responded that it would agree to the proposed transaction at $28.50 per share.  ¶ 102; Proxy 32.  Sumitovant refused.  ¶ 102; Proxy 32.  Ms. Potter informed the Special Committee that $27.00 per share was as high as Sumitovant and SMP would go, and that the transaction would not move forward if the Special Committee demanded a higher price.  ¶ 102; Proxy 32.[6]

---

[6]  The Proxy explains Skadden's involvement was limited to legal issues concerning the deal documentation.  *See* Proxy 31 (on Oct. 17, 2022, "representatives of Skadden reviewed key business and legal issues in the latest draft of the Merger Agreement" and on Oct. 19, 2022, Skadden and Sumitovant's counsel discussed "remaining open issues, apart from the price per share payable as merger consideration").  Nothing in the Proxy suggests that Skadden, a law firm, was providing business advice concerning what price to accept or what price to reject.

The Special Committee then discussed with Goldman (not Skadden) the possible financial impact of Myovant's anticipated performance and Goldman's valuation. ¶ 103; Proxy 33. Based on these discussions, the Special Committee accepted Sumitovant's proposal. ¶ 109; Proxy 33.

### 2. Proposals from Third Parties

In addition to Sumitovant, as early as August 2022, the Special Committee considered soliciting third parties regarding a potential transaction. ¶¶ 70, 131; Proxy 28. It decided not to do so. ¶¶ 71, 131; Proxy 28. The Special Committee made that decision, *inter alia*, because (1) "Sumitovant [Myovant's majority shareholder] and SMP would be unwilling to support a sale of Myovant to a third party which could make any outreach futile," (2) "the likelihood that few parties other than one of Myovant's current commercial partners would be interested in a transaction and the potential negative impact on Myovant and its relationships with third parties if such outreach were to become known," (3) "the Special Committee could determine to reach out to third parties at a later time," and (4) "the expectation that any merger agreement that might ultimately be entered into with Sumitovant would . . . allow the Special Committee to consider unsolicited inbound acquisition proposals that might be made." ¶ 70; Proxy 28. The Complaint does not allege that these reasons were either fabricated or untrue, or that they were hidden from Plaintiff.

Meanwhile, as the Proxy disclosed, on October 5, 2022, Company A, an unsolicited third-party bidder, informed Goldman that it was considering proposing a transaction with Myovant. ¶ 90; Proxy 29. Company A, however, did not believe that any such proposal would gain traction given Sumitovant's public statements that it would not sell its interest in Myovant. ¶ 91; Proxy 29–30. When Goldman was unable to persuade Company A that Sumitovant would sell, Company A declined to submit a transaction proposal. ¶ 93; Proxy 30. Goldman conveyed the contents of both discussions to the Special Committee. ¶ 93; Proxy 31. Skadden is not alleged to have had any role in, or effect on, Goldman's discussion with Company A.

**F.       The Proxy Statement**

On December 8, 2022, Myovant filed a preliminary proxy statement with the SEC
(Hadjimichael Decl., Ex. B) and an accompanying transaction statement the following day, which
included additional analyses from the parties' financial advisors ("Transaction Statement,"
Hadjimichael Decl., Ex. D).  Several weeks later, on January 23, 2023, Myovant filed the Proxy
with the SEC.  ¶¶ 6, 117.  That Proxy, the subject of this case, disclosed in detail the transaction
background described above.  The Proxy also incorporated by reference the Transaction Statement,
*see* Proxy 1, 12, 18, 22, 136, and disclosed factors that the Special Committee believed supported its
recommendation that Myovant minority shareholders approve the deal, including financial
projections and a fairness opinion by Goldman.  Proxy 34–81, Annex C; Transaction Statement.

The Proxy included robust disclosures concerning the various financial projections and
financial analysis underlying the Special Committee's decision.  Such information was available
to all investors prior to their vote on the merger.  Specifically, the Proxy disclosed that on June 28,
August 3, August 22, October 1, October 21, and October 22, 2022, the Special Committee had
discussed, including with Goldman, Myovant's financial projections (but not with Skadden).
Proxy 47–48.  Moreover, the Proxy incorporated by reference, and made available to investors
(including Plaintiff), various of Goldman's presentations to the Special Committee.  Proxy, Annex
C.  These include (1) a slide depicting Myovant's financial projections on a non-risk-adjusted and
risk-adjusted basis, (2) two tables itemizing key assumptions underlying these projections,
including price increases and volume growth in Myovant's products, (3) two tables comparing
Myovant's projections to those prepared by Myovant's Wall Street analysts, and (4) a slide
providing valuation ranges for Myovant shares of $25.54 to $30.70 per share based on a discounted
cash flow ("DCF") analysis.  Proxy, Annex C.

The Proxy also disclosed summaries of presentations by Sumitovant's financial advisor, J.P.

Morgan, to Sumitovant, including a September 27, 2022 presentation depicting value ranges of (1) $22.50–$29.50 per share, based on a DCF analysis, and (2) $20.00–28.00 per share, based on premiums paid to the undisturbed stock price in precedent minority squeeze-out transactions. Proxy 50–51; *see* ¶¶ 80–82, 96.  Ultimately, the agreed-upon merger consideration was $27.00 per share, near the upper limit of J.P. Morgan's projected value.  Proxy 50–51; *see* ¶¶ 80–82, 96.

Myovant's minority shareholders overwhelmingly approved the merger.  *See* Hadjimichael Decl., Ex. A.  More than 97% of the voting shareholders approved the transaction, including a majority of Myovant's minority shareholders.  *Id.*  The merger closed on March 10, 2023.  ¶ 120.

**G.    Plaintiff's Counsel Challenge the Preliminary Proxy**

A few days after Myovant filed its preliminary proxy, several purported Myovant shareholders (including two represented by the law firms that represent Plaintiff here) filed separate lawsuits against Myovant and its Board alleging violations of Sections 14(a) and 20(a). *Halberstam v. Myovant Sciences Ltd.*, No. 22-cv-10788 (S.D.N.Y. Mar. 8, 2023); *Schiffenbauer v. Myovant Sciences Ltd.*, No. 22-cv-10467 (S.D.N.Y. Mar. 7, 2023)**.**  The complaints alleged that the preliminary proxy was deficient because it failed to provide sufficient information concerning Myovant's financial projections, the data and inputs underlying Goldman's fairness opinion, and the background of the proposed transaction—they did not allege anything about Skadden.  *See, e.g.*, Complaint ¶ 3, *Halberstam*, No. 22-cv-10788 (Dec 21, 2022).  When Myovant filed the Proxy with additional disclosures, these lawsuits were mooted, and the claims were voluntarily withdrawn.  *See* Notice of Voluntary Dismissal, *Halberstam.*, No. 22-cv-10788 (Mar. 8, 2023); Notice of Voluntary Dismissal, *Schiffenbauer*, No. 22-cv-10467 (Mar. 7, 2023).  These are precisely the lawsuits that Delaware courts have critiqued as "serv[ing] no useful purpose for stockholders" and whose sole purpose is "to generate fees" for lawyers in what some commentators have called "little more than deal 'rents' or 'taxes.'"  *In re Trulia, Inc. Stockholder*

*Litig.*, 129 A.3d 884, 891–92, 895 (Del. Ch. 2016).  True to form, shortly after the transaction closed, but before the merger was effected, Plaintiff's counsel invited a discussion of a mootness fee.  *See* Hadjimichael Decl., Ex. L.  Myovant declined.  This lawsuit followed.

**H.    Plaintiff's Firms Try Again, Filing This Complaint**

On September 13, 2023, Plaintiff, represented by the same firms that had filed and voluntarily dismissed disclosure suits against Myovant, filed a complaint demanding post-transaction damages and the unwinding of the merger.  The Complaint alleges no deficiency in Myovant's disclosures concerning (1) the Special Committee's decision not to engage with potential third-party acquirors, (2) the negotiating history resulting in the $27.00 sale price, or (3) the potentially higher valuations derived from valuation methodologies considered by Goldman and J.P. Morgan.

Rather, Plaintiff's sole complaint is that the Proxy did not provide sufficient information about Skadden's alleged "conflicts of interest."  ¶¶ 124–131.  The allegedly omitted information is that, when retained by the Special Committee, Skadden was "simultaneously representing" SMBC (which provided acquisition financing to Sumitovant) and other Japanese companies (which through minimal investments in Sumitomo Chemical had a small indirect equity interest in SMP) on matters with *no* relation to the Sumitovant/Myovant transaction.  ¶¶ 11, 15.  While the Complaint insinuates that Skadden was conflicted, it alleges *no specific misconduct* on Skadden's part, nor that anything Skadden did affected the price negotiations between Myovant and Sumitovant (in which Skadden is not even alleged to have participated).  What the Complaint does critique is the merger negotiation process more broadly, including alleging that the Special Committee could have:

- used Cooley as their sole outside legal counsel, given that Cooley "had similar qualifications but did not appear to have any conflicts," ¶ 59;
- "aggressively test[ed]" Sumitovant's assertion that it would not approve an alternative transaction "by conducting a robust market check" and "reaching out to potential third

parties" to solicit offers, ¶ 87;

- further developed Company A's competing bid to "put pressure on Sumitovant to maximize its bid," ¶ 92; and

- granted J.P. Morgan access to the Revised Projections, which would have resulted in an "even higher" valuation of Myovant than $29.50 per share, ¶ 131.

## LEGAL STANDARD

Section 14(a) claims are subject to the Reform Act's rigorous pleading standard, which requires Plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation is made on information and belief, . . . with particularity all facts on which that belief is formed." *Bisel v. Acasti Pharma, Inc.*, 2022 WL 4538173, at *6 (S.D.N.Y. Sept. 28, 2022); 15 U.S.C. § 78u-4(b)(1)(B). These requirements apply even if a plaintiff claims to proceed solely on a negligence theory. *See* ¶¶ 145–46; *Furlong Fund LLC v. VBI Vaccines, Inc.*, 2016 WL 1181710, at *3 (S.D.N.Y. Mar. 25, 2016).

Moreover, no claim under Section 14 will lie when, as here, the Proxy, read as a whole and in context, "was complete and accurate enough to allow a shareholder to make an informed decision." *Bond Opportunity Fund v. Unilab Corp.*, 2003 WL 21058251, at *5 (S.D.N.Y. May 9, 2003), *aff'd*, 87 F. App'x 772 (2d Cir. 2004). "The 'central issue is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor.'" *Furlong*, 2016 WL 1181710, at *3 (quoting *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996)).

## ARGUMENT

### I.    The Complaint Fails to State a Section 14 Claim

#### A.    Plaintiff Cannot Assert a Fiduciary Duty Claim Disguised as a Section 14 Claim

Plaintiff labels his claim as arising under Section 14 of the Exchange Act, but his real complaint is that the Special Committee allegedly "squandered its opportunity to conduct a robust

market check" and "chose to deprive itself of negotiating leverage by adopting a 'controlled mindset' under which it entertained only two options." ¶ 72. In other words, Plaintiff's real issue is that he believes he would have gotten a better deal if the Special Committee had pushed Sumitovant for a higher per-share price, pursued a higher bid from another company, or walked away from the merger altogether. *See* ¶¶ 16–18, 70–72, 75, 104. This is a paradigmatic example of a fiduciary duty claim, and the Complaint thus fails to state a Section 14 claim.

The Second Circuit has "long recognized that no general cause of action lies under § 14(a) to remedy a simple breach of fiduciary duty." *Koppel v. 4987 Corp.*, 167 F.3d 125, 134 (2d Cir. 1999); *accord In re Columbia Pipeline*, 405 F.Supp.3d 494, 517 (S.D.N.Y. 2019) (whether a potential bidder was given preferential treatment is "not a legitimate disclosure" or "fact" under Section 14(a)).[7] Yet, the Complaint is full of allegations that the Special Committee failed to act in the best interests of the minority shareholders during the merger process:

- the Special Committee did not make "any effort whatsoever to reach out to other potential counterparties," ¶ 71;

- "the Special Committee squandered its opportunity to conduct a robust market check, and chose to deprive itself of negotiating leverage by adopting a 'controlled mindset' under which it entertained only two options," ¶ 72; and

- shareholders would have received a better value for their shares had the Special Committee decided to "remain "independent" and pursue other "potential counterparties." ¶¶ 16, 18, 87, 115.

These allegations—which are based on the Proxy's detailed and voluminous disclosures— "constitute no more than [a Bermudan] law breach of fiduciary duty claims under a thin coat of federal paint." *Koppel*, 167 F.3d at 133. Because Plaintiff does not allege a disclosure violation under Section 14(a) and Rule 14a-9, the claim must be dismissed. *See In re Pfizer Inc. v. S'holder*

---

[7]    *See also, e.g.*, *Kas v. Financial General Bankshares*, 796 F.2d 508, 513 (D.C. Cir. 1986) ("[A] plaintiff may not 'bootstrap' a claim of breach of fiduciary duty into a federal securities claim by alleging that directors failed to disclose that breach of fiduciary duty."); *Panter v. Marshall Field & Co.*, 646 F.2d 271, 287–88 (7th Cir. 1981) (same).

*Derivative Litig.,* 722 F. Supp. 2d 453, 464 (S.D.N.Y. 2010) (Rakoff, J.) (failure to disclose "'information regarding a breach of fiduciary duty' cannot support an alleged proxy violation, even if it might be considered relevant to the shareholders' vote").

**B.    None of the Allegedly Omitted Facts Is Material**

"A fact is material for purposes of Rule 14a-9 if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Koppel*, 167 F.3d at 131 (cleaned up).  The Complaint fails to demonstrate that any allegedly omitted fact about Skadden's "conflicts" or other representations was material.

*First*, the Complaint ignores that the relevant inquiry is "whether defendants' representations, taken together *and in context*, would have mislead a reasonable investor about the nature of the securities.'" *Furlong*, 2016 WL 1181710, at *3; *Lanigan Grp., Inc. v. Li-Cycle Holdings Corp.*, 2023 WL 6541884, at *8 (E.D.N.Y. Oct. 6, 2023) ("Section 14(a) does not absolve an investor from reading the Proxy and contextualizing statements in light of the 'total mix' of information available to it.").  When assessed in the context of Myovant's detailed Proxy— which disclosed the negotiating history and the valuation ranges considered by the parties' advisors on which the Plaintiff now relies, Proxy 25–34—nothing about the challenged statements could have misled the minority shareholders about the issues at the heart of the Plaintiff's actual complaints: the nature of the merger transaction, price to be paid, negotiations and valuations that led to that price, or process that the Special Committee followed to recommend the merger.  *See In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 215 (S.D.N.Y. 2020) (alleged omissions or misrepresentations were immaterial in comparison to what was disclosed in the proxy materials).  If Plaintiff's theory is that Skadden's involvement led to the merger being consummated at "a suboptimal price" for the minority shareholders, ¶ 16, 130, then the information relevant to reasonable investors was already contained within the four corners of the Proxy, *see supra* pp. 9–

10.  The detailed negotiation background, information about third-party bids, financial projections and analyses, and opinions of Goldman and J.P. Morgan upon which the Complaint now relies were readily available to anyone who wished to question whether the merger negotiation process was fairly conducted.  *See id*.  Plaintiff raises no issue with respect to these disclosures.

*Second*, the Complaint fails to allege that reasonable investors would be "substantially likely" to consider Skadden's representations of separate legal entities in ***unrelated*** matters to be material.  *See Koppel*, 167 F.3d at 131; *Assad v. Botha*, 2023 WL 7121419, at *5 (Del. Ch. Oct. 30, 2023) (Morgan Stanley's allegedly conflicted work for companies holding 12% and 13% of merger counterparty's equity was "unimportant to a reasonable . . . stockholder deciding how to vote"); *In re Micromet, Inc. S'holder Litig.*, 2012 WL 681785, at *12 (Del. Ch. Feb. 29, 2012) (omission of financial advisor's small equity interest in defendant corporation not material absent allegations that this factor was "likely to impede its ability effectively and loyally to perform its assignment").  Rather, Skadden's limited role in the negotiations, ¶¶ 94, 99–102, Goldman's far more significant role as financial advisor, ¶¶ 94, 97–98, the Special Committee's thoughtful consideration of whether to pursue third-party bids in general (and Company A's in particular), Proxy 28–31, ¶¶ 87, 90–91, 93–94, and the reasons the Special Committee did not pursue such third-party bids, Proxy 36, ¶¶ 70–71, 87, all were disclosed and all undermine Plaintiff's post-hoc attribution of importance to the question of Skadden's potential conflicts.

*Third*, even if the information about Skadden's purported conflicts was important to reasonable investors, information about Skadden's past and current representations was publicly disclosed.  *See* Hadjimichael Decl., Exs. E–K; *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 668 (2d Cir. 2009) (omission of information "already in the public domain and reasonably available to" shareholder is not material).  Indeed, Plaintiff had no trouble locating this information for the

Complaint.  *See* ¶¶ 10–15, n.6–12; *In re Merrill Lynch & Co., Inc. Rsch. Rep. Sec. Litig.,* 272 F. Supp. 2d 243, 249–50, 253 (S.D.N.Y. 2003) ("Plaintiff's own Complaint demonstrates that information . . . was publicly available" and "therefore cannot show that such information was concealed" from investors or "plead any material omissions that the Defendants had a duty to disclose.").  Defendants were under no obligation to repeat this publicly available information. *See id.* at 252 n.7 (information "was public knowledge and need not have been repeated in the offering documents").  Nor must Defendants disclose each and every fact that might be of interest to investors.  *See Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) ("Disclosure of an item of information is not required" under federal securities laws "simply because it may be relevant or of interest to a reasonable investor."); *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267 (2d Cir. 1993) ("But a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.").

Far from exposing a material omission, Plaintiff engages in "exactly the sort of 'nitpicking' that the Second Circuit has warned 'should not become the name of the game' in Section 14(a) cases." *Schmitt v. China XD Plastics Co., Ltd.*, 2023 WL 6385763, at *8 (E.D.N.Y. Sept. 29, 2023) (citing *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1200 (2d Cir. 1978)).

## C.    None of the Challenged Statements Is False

### 1.    The Challenged Statements Are Inactionable Opinions

The only statements in the Proxy challenged by Plaintiff—statements concerning Skadden's absence of conflicts and independence, ¶¶ 58, 109, 128–29—reflect the Special Committee's subjective assessment of Skadden's qualifications and are inactionable expressions of opinion.  "An opinion is a belief, a view, or a sentiment which the mind forms of persons or things." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015) (cleaned up). "[A] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless

whether an investor can ultimately prove the belief wrong." *Id.* at 186.  The federal securities laws are not "an invitation to Monday morning quarterback an issuer's opinion." *Id.*[8]

Under Omnicare, pleading an "opinion" claim is "no small task." *Id.* at 194.  "The Supreme Court has emphasized that th[e] standard will not be easy to satisfy." *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 400 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021).  To surmount *Omnicare*, Plaintiff must allege (and, here, he has not alleged): (i) that the challenged statements of opinion were not genuinely believed when made; or (ii) "particular (and material) facts" establishing that the issuer lacked a basis for the opinion expressed. *Tongue*, 816 F.3d at 209.

As an initial matter, the Complaint makes no allegations of fraud.  *See* ¶ 145 (alleging "Defendants were at least negligent in filing the Proxy with these material misrepresentations and omissions.").  As in *Omnicare*, this means that Plaintiff cannot contest that Myovant or the Special Committee genuinely believed its opinions regarding Skadden's lack of conflicts and independence. *See Omnicare*, 575 U.S. at 186 ("[T]he Funds do not contest that Omnicare's opinion was honestly held.  Recall that their complaint explicitly excludes and disclaims any allegation sounding in fraud or deception.") (cleaned up).  The Complaint is also devoid of even a *single* allegation, well-pleaded or otherwise, that Myovant or the Special Committee (1) did not think that Skadden was independent, or (2) were aware of facts contradicting that opinion.

This leaves Plaintiff to argue that Defendants lacked a basis for their opinion.  But Plaintiff

---

[8] The purported omissions Plaintiff identifies (¶¶ 58, 128) do not state a claim because they "are directly related to the earlier statements Plaintiff[] also claim are false." *Waggoner v. Barclays PLC,* 875 F.3d 79, 96 (2d Cir. 2017).  The Second Circuit has made plain that a plaintiff cannot prevail on an omission theory that is "'simply the inverse of the [p]laintiffs' misrepresentation allegations,' because the only thing they omitted was the 'truth that the statement misrepresents.'" *Schwab v. E*TRADE Fin. Corp.,* 752 F. App'x 56, 59 (2d Cir. 2018).  Courts consistently reject such circular attempts because the omissions are "defined in terms of the absence of the information that would correct the misrepresentation." *In re Lehman Bros. Sec. & ERISA Litig.,* 2013 WL 5730020, at *3 (S.D.N.Y. Oct. 22, 2013).

makes no specific allegations suggesting that the Special Committee did not evaluate Skadden's suitability as a legal advisor. On the contrary: the Proxy details—and Plaintiff acknowledges, ¶¶ 20, 55, 59, 128—the robust process the Special Committee used when determining whether to retain advisors. Proxy 25–26. Among other things, that process involved review of "the proposed forms of engagement letters," and "any potential conflicts of interest such advisors may have with respect to a potential transaction involving Sumitovant." *Id*. Plaintiff admits the Special Committee approved those engagements, opining "that such advisers 'were not disqualified from being engaged by the Special Committee by virtue of any potential conflicts of interest.'" ¶ 55. Tellingly, Plaintiff does not allege that this process was not followed when Skadden was retained.

Similarly, Plaintiff does not allege that Skadden failed to run a conflicts check, as is required by the New York Rules of Professional Conduct, or that Skadden informed the Special Committee that it was anything other than conflict free and in a position to take on the representation. Nor does Plaintiff grapple with the ABA's guidance that "affiliates should not be considered a single entity for conflicts purposes based solely on the fact" of some alleged corporate affiliation, "at least when the subsidiary is not otherwise operationally integrated with the parent company." *GSI Com. Sols., Inc. v. BabyCenter, L.L.C.*, 618 F.3d 204, 211 (2d Cir. 2010). Plaintiff simply concludes that legally separate entities are related for conflict purposes without articulating *any* facts suggesting their operations are sufficiently integrated.

Finally, Plaintiff does not identify factual statements omitted from the Proxy "whose omission makes the statement [of opinion in the Proxy] misleading to a reasonable investor." *Tongue*, 816 F.3d at 210; *see also Omnicare*, 575 U.S. at 194. The alleged omissions—prior or concurrent relationships and representations unrelated to the transaction at hand, ¶ 58—do not make any of the challenged statements misleading because "'[r]easonable investors understand that

opinions sometimes rest on a weighing of competing facts" and a "reasonable investor does not

expect that *every* fact known to an issuer supports its opinion statement." *Omnicare*, 575 U.S. 189–

90. In other words, an opinion is not misleading merely because "an issuer knows, but fails to

disclose, some fact cutting the other way." *Id.* Skadden and the Special Committee were free to

reach an opinion regarding the absence of conflicts even if someone else might feel differently.

Ignoring the Supreme Court's stance on this issue, Plaintiff simply concludes that there

must have been a conflict (based on publicly available information) and asserts that he and other

investors "plainly would have wanted to know" about Skadden's prior representations. ¶ 20. But

"[d]isclosure of an item of information is not required" simply because it may be "of interest to a

reasonable investor." *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152–53 (2d Cir. 2013); *see also*

*Arkansas Pub. Emps. Ret. Sys. v. Bristol Myers Squibb Co.*, 28 F.4th 343, 353 (2d Cir. 2022) ("Just

because a reasonable investor would very much like to know a fact does not create any obligation

to speak up.") (cleaned up). That Plaintiff might "have preferred to have more information

regarding" Skadden's prior legal work, "is irrelevant to a determination of actionable falsity." *In*

*re Keryx Biopharmaceuticals, Inc. Sec. Litig.*, 2014 WL 585658, at *11 (S.D.N.Y. Feb. 14, 2014).

### 2. The Challenged Statements Are Not Adequately Alleged to be False Even if Considered to be Statements of Fact

Even if the challenged statements are deemed to be facts, not opinions, the Complaint still

fails. Plaintiff does not plead facts that establish Skadden was conflicted when evaluated under the

framework of the applicable ethical rules. Rule 1.7 of the ABA's Model Rules of Professional

Conduct provides that a conflict exists only if the representation of one client will be "directly

adverse" to another or if there is a "significant risk" that the lawyer's advice will be "materially

limited" by the concurrent representation. Model Rules of Pro. Conduct r. 1.7 (Am. Bar Ass'n

2023). Neither form of conflict is sufficiently alleged here.

### i.    *Skadden's Other Clients Not "Directly Adverse" to the Special Committee*

Direct adversity requires "simultaneous representation of one existing client in a matter adverse to another existing client." *GSI*, 618 F.3d at 209.  In essence, Skadden would need to be on both sides of the transaction. *See, e.g.*, *Akagi v. Turin Hous. Dev. Fund Co.*, 2017 WL 1076345, at *14 (S.D.N.Y. Mar. 22, 2017) (joint representation of defendants was "adverse" because one defendant had a "significant financial incentive to ensure [the other] loses"); *see also First NBC Bank v. Murex, LLC*, 259 F. Supp.3d 38 (S.D.N.Y. 2017) (representation was "adverse" where the counsel representing plaintiff in the instant lawsuit concurrently represented defendant in related EPA regulatory matters).  The Complaint does not allege (nor could it) that Skadden's representation of any other client was "directly adverse" to Myovant's Special Committee, or vice versa.  In fact, the Complaint does not allege that Skadden represented any party other than the Special Committee in connection with this transaction.

Nor does Skadden's representation of SMBC create direct adversity, even if SMBC provided financing to Sumitovant, because Skadden is not alleged to have advised on that financing.  Where Skadden's representation of SMBC was solely on a matter **unrelated** to the Sumitovant/Myovant transaction, that representation does not conflict Skadden.

### ii.    *No Significant Risk of a Material Limitation*

Plaintiff's argument therefore hangs on the Complaint's ability to allege a "significant risk" that Skadden's other client representations "materially limited" its ability to advise the Special Committee.  Model Rules of Pro. Conduct r. 1.7.  The allegations support no such risk.  As the commentary to the Model Rules advises, the "critical questions" in assessing a "material limitation" include: (1) "the likelihood that a difference in interests will eventuate and," (2) "if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf

of the client." Model Rules of Pro. Conduct r. 1.7 cmt. 8. The Complaint fails to address these questions at all, alleging only that Skadden was engaged in other representations for unrelated matters that, the Complaint speculates:

> *could have* skewed Skadden's advice to the Special Committee towards consummating a deal with Sumitovant even at a suboptimal price for Minority Myovant Shareholders and *against* soliciting competing bids (i.e., to avoid causing [SMBC] to lose the opportunity to provide $1.7 billion in financing to close the Merger, and avoid affecting future business from Sumitomo Nikko, Sumitomo Trust, and other members of the Sumitomo Group *keiretsu* by not causing [SMP] and Sumitomo Chemical to lose the opportunity to acquire Myovant).

¶ 130.  The operative phrase in this highly attenuated hypothetical is "could have."[9]  *Id.*  The Complaint does not contain a single fact—not one—that would support the inference that Skadden's advice was, in any way, skewed by these unrelated representations.  Instead, Plaintiff resorts to rank speculation and unsupported conjecture that Skadden would risk jeopardizing its reputation in the legal profession (and countless potential engagements and fees) by biasing its advice in favor of one financing deal.  ¶¶ 10–17.  The Complaint does not offer concrete facts to support this fanciful theory, and as the commentary cautions, "[t]he mere possibility of subsequent harm does not" constitute a conflict requiring "disclosure and consent."  Model Rules of Pro. Conduct r. 1.7 cmt. 8; *cf. Bond Opportunity Fund*, 87 F. App'x at 773 (holding that "mere speculation is insufficient to satisfy the [Reform Act] pleading standard").

That possibility becomes still more remote when one considers Plaintiff's alternative theory that Skadden was conflicted because it advised—again, on matters unrelated to the

---

[9]   This allegation is not only hypothetical but counterfactual.  The Complaint itself alleges that the Special Committee, in consultation with Goldman and other advisors aside from Skadden, (1) pushed Sumitovant to the very top of its negotiating authority of $27.00 per share, ¶¶ 97–102, (2) made a counteroffer seeking $28.50 per share, which was rejected, ¶¶ 101–102, (3) welcomed interest from a third party, Company A, that ultimately chose not make an offer, ¶¶ 90–91, 93, and (4) fully, and on multiple occasions, explained to investors its reasoning for not further pursuing third-party offers, ¶¶ 70, 73, 91, 94.

merger—entities that had small equity stakes in publicly traded Sumitomo Chemical, an indirect 51.76% owner of SMP. ¶ 37. Specifically, the Complaint alleges that Skadden was conflicted by virtue of its representation of three entities that owned publicly traded equity interests in Sumitomo Chemical: SMBC (1.41% stake in Sumitomo Chemical), Sumitomo Trust (1.77% equity interest in Sumitomo Chemical), and Sumitomo Life (4.34% equity interest in Sumitomo Chemical). ¶¶ 10–15, 38. Accounting for Sumitomo Chemical's 51.76% interest in SMP means that SMBC had a .73% interest in SMP, Sumitomo Trust had a .92% interest in SMP, and Sumitomo Life had a 2.25% interest in SMP—or, all told, an equity interest of less than 4%. Contrary to Plaintiff's insinuation, such minimal equity stakes do not create a conflict. *See* ABA Comm. on Ethics & Pro. Resp., Formal Op. 95-390 (1995) ("[C]orporate affiliation, without more, does not make all of a corporate client's affiliates into clients as well," and a corporation's "constituents, including its stockholders, are not also the lawyer's clients solely because of their relationship to the client."); *Whiting Corp. v. White Mach. Corp.*, 567 F.2d 713, 714 (7th Cir. 1977) (affirming refusal to disqualify plaintiff's counsel who previously had represented company that "owns over 20 percent of the outstanding shares of" defendant on matters that were "wholly unrelated to the subject matter of the case on appeal"); *see also Brooklyn Navy Yard Congregation Partners, L.P. v. PMNC*, 663 N.Y.S.2d 499, 500 (Sup. Ct. 1997) (treating related corporations as separate "for conflicts purposes" absent "evidence . . . that the 'dominion [of the parent over the subsidiary is] so complete, [the] interference so obtrusive' as to rebut the presumption that they are separate and distinct legal entities"), *aff'd sub nom. Brooklyn Navy Yard Cogeneration Partners, L.P. v. PMNC*, 679 N.Y.S.2d 312 (2d Dep't 1998).[10]

---

[10]    *See also GSI*, 618 F.3d at 211 (reasoning that "affiliates should not be considered a single entity for conflicts purposes based solely on the fact that one entity is a wholly-owned

Meanwhile, the Complaint's allegations that these entities are connected into an amorphous "Sumitomo Group," ¶¶ 5, 8, 10, 11–15, and Skadden was incentivized to skew its advice so as not to "affect[] future business," ¶ 130, are exactly the type of "[possib[le] . . . subsequent harm[s]" that cannot constitute a conflict. Model Rules of Pro. Conduct r. 1.7 cmt. 8; *see also GSI*, 618 F.3d at 210–12 (discussing the factors that must exist for a court to find "substantial operational commonal[i]ty" sufficient "to treat the two [separate] entities as one client").[11]

## D.    Plaintiff Fails to Allege Negligence

Plaintiff ignores that it must plead more than strict liability to state a Section 14(a) claim. *See In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 529 (S.D.N.Y. 2021) (collecting cases). The Complaint must "plead with particularity facts" establishing each Defendant's negligence. *Bond Opportunity Fund*, 2003 WL 21058251, at *4; *Furlong*, 2016 WL 1181710, at *3 ("The complaint must also allege 'that defendants acted at least with negligence in making the misrepresentation or omission.'"). "[M]ere speculation is insufficient to satisfy the [Reform Act] pleading standard" applicable to a Section 14(a) claim, *Bond Opportunity Fund*, 87 F. App'x at 773, and group pleading is not permitted, *Bond Opportunity Fund*, 2003 WL 21058251, at *4 ("Plaintiff[] may not impute knowledge to the individual Defendants solely on the basis of the positions they held.").

The Complaint does not allege a single fact in support of this critical element of the claim. Plaintiff does not say what any Defendant did or did not do to ensure the accuracy of the challenged

---

subsidiary of the other"); *cf. Six W. Retail Acq., Inc. v. Sony Theatre Mgmt. Corp.*, 2003 WL 282187, at *6 (S.D.N.Y. Feb. 7, 2003) ("[F]or conflict purposes, representation of one corporate affiliate does not necessarily constitute representation of that entity's parent, subsidiary or sister corporation" and characterizing as "disingenuous" the "plaintiff's repeated use of the general term 'Sony' . . . to describe the [legally separate] defendants[.]"), *aff'd sub nom. Six W. Retail Acq., Inc. v. Sony Pictures Entm't Corp.*, 124 F. App'x 73 (2d Cir. 2005).

[11]  Indeed, if taken to its logical conclusion, Plaintiff's theory would bar any large U.S. law firm from representing the seller in a take-private transaction, as inevitably the bank providing buyer-side financing would be a current or former client in unrelated matters.

statements, does not explain how or why the Defendants knew or should have known that their statements allegedly were false, and does not address at all the process by which a decision was reached to include (or exclude) particular information from the Proxy. Plaintiff's lone allegation—"Defendants were at least negligent in filing the Proxy with these material misrepresentations and omissions," ¶ 145—is nothing more than a group-pleaded and "[t]hreadbare recital[] of a cause of action's elements," *Ashcroft v. Iqbal*, 556 U.S. 678, 663 (2009), and so dismissal is required.

In fact, the Proxy included robust disclosures concerning the Special Committee's decision to retain advisors. *See supra* pp. 5–6. In particular, the Proxy disclosed that on April 28, 2022, the Special Committee reviewed "proposed forms of engagement letters" and "disclosures regarding any potential conflicts of interest such advisors may have with respect to a potential transaction involving Sumitovant." Proxy 25; *see* ¶¶ 55, 57. Plaintiff does not allege that this process was not undertaken when Skadden was later retained. Moreover, Plaintiff nowhere pleads the Defendants knew or should have known of any misstatement or omission regarding Skadden's independence. *See Bond Opportunity Fund*, 2003 WL 21058251, at *10 ("[I]t is difficult to imagine that the directors knew or should have known of the alleged flaws in the financial analyses[.]").[12]

## II.     The Complaint Fails to State a Section 20 Claim

Because Plaintiff fails to plead an underlying Section 14(a) violation, the Section 20(a) "control person" claim also fails. *See In re Columbia Pipeline*, 405 F. Supp. 3d at 523; *Tiberius Cap., LLC v. PetroSearch Energy Corp.*, 2011 WL 1334839, at *8 (S.D.N.Y. Mar. 31, 2011) (finding that plaintiff's "control liability claim is defective" because it failed to allege an

---

[12]   Plaintiff's failure to plead even negligence means he is not entitled to rescission of the merger. The Second Circuit long has held that "[r]escission is an extraordinary remedy, appropriate only where the breach is found to be 'material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the'" underlying purpose. *Canfield v. Reynolds*, 631 F.2d 169, 178 (2d Cir. 1980) (citing *Callanan v. Powers*, 92 N.E. 747, 752 (1910)).

underlying Rule 14a-9 securities violation), *aff'd*, 485 F. App'x 490 (2d Cir. 2012).

Plaintiff's Section 20(a) claim independently fails because he makes no particularized allegations of culpable conduct by any allegedly controlling person. *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 307–08 (S.D.N.Y. 2008) ("[P]laintiffs must plead culpable participation with particularity, as required by the [Reform Act]."); *In re Alstom SA*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005) (same). There is no allegation that the Individual Defendants knew of Skadden's unrelated representations or the distant ties between Skadden's other clients and Sumitovant. In fact, the section devoted to the Individual Defendants makes no specific mention of an allegedly fraudulent statement. *See* ¶¶ 109–121. "[B]oilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to" survive dismissal. *In re Sotheby's Holdings, Inc.*, 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000); *see also Fogel v. Wal-Mart de México SAB de CV*, 2017 WL 751155, at *15–16 (S.D.N.Y. Feb. 27, 2017) (attempts to plead scienter based on corporate position "fall well short of the high bar required . . . to plead adequately conscious misbehavior or recklessness"), *aff'd sub nom. Fogel v. Vega*, 759 F. App'x 18 (2d Cir. 2018).[13]

## CONCLUSION

For the reasons set forth above, the Court should grant Defendants' Motion to Dismiss the Amended Complaint with prejudice.

---

[13] Allegations that the Individual Defendants signed the Proxy, ¶¶ 30, 32–33, similarly fail to establish control person liability. *See Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018) (no inference of fraudulent intent "based on the signing of a certification" absent allegations tying the "concomitant awareness of or recklessness to the materially misleading" statements).

Dated: Redwood City, California          Respectfully submitted,
       October 31, 2023


*/s/ Boris Feldman*


FRESHFIELDS BRUCKHAUS DERINGER US LLP

Boris Feldman (admitted *pro hac vice*)
Elena Hadjimichael
855 Main Street
Redwood City, California 94063
Telephone: (650) 618-9250
boris.feldman@freshfields.com
elena.hadjimichael@freshfields.com

David Y. Livshiz
Peter J. Linken
Nathan A. Hembree
601 Lexington Avenue, 31st Floor
New York, NY 10022
Telephone: (212) 277-4000
david.livshiz@freshfields.com
peter.linken@freshfields.com
nate.hembree@freshfields.com

*Counsel for Defendants*