UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH ZAPPIA, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br><br>  -v-<br><br>MYOVANT SCIENCES LTD., MYOVANT SCIENCES, INC., SUMITOMO PHARMA AMERICA, INC., TERRIE CURRAN, MARK GUINAN, DAVID MAREK, NANCY VALENTE, AND MATTHEW LANG,<br><br>      Defendants. | 23-cv-8097 (JSR)<br><br><br>OPINION AND ORDER |

JED S. RAKOFF, U.S.D.J.:

In this putative class action, Lead Plaintiff Joseph Zappia alleges that Myovant Sciences Ltd. ("Myovant") and other defendants filed with the SEC a materially false and misleading proxy statement in connection with Myovant's acquisition, in violation of Rule 14a-9 promulgated under Section 14(a) of the Securities Exchange Act. In particular, Zappia takes issue with the proxy statement's representation that Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), the law firm hired to represent Myovant's special committee for the acquisition, had an "absence of conflicts" and was "independent." In reality, Zappia contends, Skadden had a conflict and lacked independence because of its

- 1 -

representation of companies that shared "informal business relations" with, and small indirect ownership interests in, Myovant's acquirer. The Court now grants defendants' motion to dismiss the Amended Complaint because it fails to plausibly allege a materially false or misleading statement or omission.

I.   Factual and Procedural Background

Defendant Myovant, a biopharmaceutical company that has developed drugs to treat hormone-sensitive conditions, was acquired by its majority shareholder Sumitovant Biopharma Ltd. ("Sumitovant") in an all-cash merger on March 10, 2023. ECF No. 19 ("Am. Compl."), at ¶¶ 2-4, 45, 119. Sumitovant is a wholly owned subsidiary of Japanese pharmaceutical company Sumitomo Pharma Co., Ltd. ("Sumitomo Pharma"), itself majority-owned (51.76%) by Sumitomo Chemical Co., Ltd. ("Sumitomo Chemical"). Id. ¶¶ 3-4. Sumitomo Pharma and Sumitomo Chemical are members of the "Sumitomo Group," a leading *keiretsu* in Japan. Id. ¶ 5. As the Amended Complaint alleges, "[k]eiretsu are networks of Japanese businesses connected by cross-shareholdings and informal business relations, which typically feature a member bank that lends funds to other companies in the *keiretsu*." Id. That member bank for the Sumitomo Group is Sumitomo Mitsui Banking Corporation ("Sumitomo Banking"), which provided the financing for Sumitovant's $1.7 billion acquisition of Myovant. Id. ¶ 8. Sumitomo Banking owns

- 2 -

approximately 1.4% of Sumitomo Chemical, the corporate grandparent of Sumitovant. Id.

On January 23, 2023, Myovant's board filed, with the authorization of the individual co-defendants,[1] a proxy statement with the SEC, soliciting Myovant's public shareholders to vote in favor of the acquisition by Sumitovant. Id. ¶¶ 6-7. The merger was expressly conditioned not only on approval by a majority of Myovant public shareholders -- which could be satisfied with Sumitovant's vote alone, because Sumitovant then owned approximately 52% of Myovant -- but also approval by a majority of Myovant's minority shareholders. Id. ¶¶ 4, 7. Those conditions were satisfied on March 1, 2023, when Sumitovant and a majority of Myovant's other public shareholders voted in favor of the merger for $27 per share. Id. ¶¶ 3, 9. That price had been negotiated by a special committee of Myovant's three independent directors, which retained Goldman Sachs as its financial advisor and Skadden as its legal advisor. Id. ¶¶ 9, 18. As a result of the special committee's negotiations, Sumitovant over time increased its initial offer of $22.75 per

_____

[1] Co-defendants Terrie Curran, Mark Guinan, David Marek, Nancy Valente, and Matthew Lang were at all times here relevant members of Myovant's board of directors. Curran, Guinan, and Valente, the non-officer directors, comprised the special committee. See Am. Compl. ¶¶ 29-33.

share, to $25.25 per share, to $26.25 per share, to $26.75 per share, and ultimately to its best and final offer of $27 per share, which the special committee eventually accepted and shareholders approved. Id. ¶¶ 84, 97-100.

On September 13, 2023, Joseph Zappia, who owned Myovant shares at the time of the merger and voted in the merger's favor, filed this putative class action against Myovant, Myovant's U.S. subsidiary (Myovant Sciences, Inc.) that employed its executives, Sumitomo Pharma America, Inc.,[2] and five of Myovant's officers and/or directors, alleging that the proxy statement contained materially false and misleading statements in violation of Section 14(a) of the Securities Exchange Act and accompanying Rule 14a-9. Id. ¶¶ 140-48; see ECF No. 1. On consent, the Court appointed Zappia as Lead Plaintiff on October 10, 2023, see ECF No. 18, and Zappia filed an Amended Complaint on October 17, 2023, see ECF No. 19.

The Amended Complaint takes issue with Myovant's representation in the proxy statement that the Skadden law firm was chosen as a legal advisor to Myovant's special committee "based

---

[2] On July 1, 2023, Sumitovant and other U.S. subsidiaries of Sumitomo Pharma were combined into Sumitomo Pharma America, Inc. Id. ¶ 28.

- 4 -

on, among other things, . . . the absence of conflicts on the part of Skadden" and the related representation in the proxy statement that Skadden was "independent." Am. Compl. ¶¶ 9, 21 n.13. Zappia alleges that Skadden was in fact conflicted in its representation of the special committee because Skadden was concurrently representing and had previously represented Sumitomo Banking, which financed the merger, and other members of the Sumitomo Group, in other (unrelated) matters. Id. ¶¶ 10-14. Zappia further alleges that the individual co-defendants are liable as control persons under Section 20(a) of the Exchange Act. Id. ¶¶ 149-54. According to the Amended Complaint, "[d]efendants were at least negligent in filing the Proxy with these material misrepresentations and omissions." Id. ¶ 145.

On October 31, 2023, defendants moved to dismiss the Amended Complaint. See ECF No. 24 ("Mem."). After full briefing, see ECF Nos. 31 ("Opp."), 35 ("Reply"), the Court heard oral argument on December 12, 2023.

II.  Legal Background

Section 14(a) of the Exchange Act imposes liability on any person who violates a rule promulgated by the SEC about proxy statements "in respect of any security." 15 U.S.C. § 78n(a). One such promulgation is Rule 14a-9, which provides that no proxy statement may "contain[] any statement which, at the time and in

- 5 -

the light of the circumstances under which it is made, is false or misleading with respect to any material fact." 17 C.F.R. § 240.14a-9(a). "A fact is material for purposes of Rule 14a-9 if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." Koppel v. 4987 Corp., 167 F.3d 125, 131 (2d Cir. 1999).[3] "Once the proxy statement purports to disclose the factors considered by the board of directors, there is an obligation to portray them accurately." Id. "A private right of action under Rule 14a-9 is well established." Id.

"Under Rule 14a-9, plaintiffs need not demonstrate . . . knowing conduct . . . with an intent to deceive." Wilson v. Great Am. Indus., Inc., 855 F.2d 987, 995 (2d Cir. 1987). "Liability can be imposed for negligently drafting a proxy statement." Id. However, even where, as here, a plaintiff alleges that defendants violated Rule 14a-9 negligently, rather than through fraud, the Private Securities Litigation Reform Act's provisions requiring specificity apply in assessing the sufficiency of the pleadings. See In re Bemis Co. Sec. Litig., 512 F. Supp. 3d 518, 528-29 (S.D.N.Y. 2021). In particular, the complaint must "specify each

---

[3] Here and elsewhere, internal alterations, citations, ellipses, and quotation marks have been omitted unless otherwise indicated.

statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

III. <u>Analysis</u>

Whether assessed under the usual plausibility standard of Rule 12(b)(6) or the more stringent standard of the Private Securities Litigation Reform Act (PSLRA), the Amended Complaint fails to adequately allege a false or misleading statement or misleading omission. Additionally, the information supposedly omitted from the alleged misstatements was a matter of public knowledge. Finally, an independent basis for dismissal is that the Amended Complaint fails to adequately allege negligence.

The Amended Complaint does not support with well-pleaded facts its allegation that Skadden harbored a conflict of interest in representing the special committee. The Amended Complaint states that "[w]hen the Special Committee retained Skadden based on a purported 'absence of conflicts,' Skadden was concurrently representing Sumitomo Banking (which financed the Merger), as well as another member of the Sumitomo Group . . . and other affiliated entities, in connection with a strategic alliance with Jefferies Financial Group, Inc." Am. Compl. ¶ 10. Similarly, "Skadden was concurrently representing Sumitomo Banking in a strategic collaboration with Marathon Capital LLC." <u>Id.</u> ¶ 12. In addition, "Skadden was concurrently representing another member of the

- 7 -

Sumitomo Group, Sumitomo Mitsui Trust Bank, Limited ('Sumitomo Trust'), and Sumitomo Trust's parent . . . in connection with a strategic partnership with Apollo Global Management, Inc." Id. ¶ 13. Finally, "Skadden was concurrently representing Sumitomo Group member Sumitomo Nikko in connection with its role as international joint lead manager of the $459 million initial public offering . . . of Socionext Inc." Id. ¶ 14.[4]

The above allegations, even if taken as true for purposes of this motion, do not plausibly demonstrate a conflict of interest in Skadden's representation of the Myovant special committee. The Amended Complaint does not allege that Skadden has ever represented Sumitovant, the actual counterparty in the merger transaction, or its corporate parent, Sumitomo Pharma. And the Second Circuit has held that corporate "affiliates should not be considered a single entity for conflicts purposes based solely on the fact that one entity is a wholly-owned subsidiary of the other, at least when the subsidiary is not otherwise operationally integrated with the parent company." GSI Commerce Sols., Inc. v. Baby Center, LLC, 618 F.3d 204, 211 (2d Cir. 2010). Here, the Amended Complaint does not

_____

[4] The Amended Complaint also points out that, more than a year before Skadden's representation of the special committee, the firm represented Sumitomo Banking and the U.S. subsidiary of Sumitomo Nikko in yet other unrelated matters. See Am. Compl. ¶ 15 n.12.

even allege that Sumitovant is a wholly-owned subsidiary of any of the other Sumitomo Group entities that Skadden represented (or vice versa). Rather, some of those entities owned minor holdings -- just a few percent ownership -- in a different Sumitomo Group entity, Sumitomo Chemical, that was a majority owner of Sumitovant's corporate grandparent. For instance, as of September 30, 2022, Sumitomo Banking owned 1.41%, and Sumitomo Trust owned 1.77%, of Sumitomo Chemical. Am. Compl. ¶ 38. This, by itself, is insufficient to establish a conflict.

Nor does the Amended Complaint allege that the other Sumitomo Group entities that Skadden represented were "operationally integrated" with Sumitovant in any meaningful way. GSI Commerce, 618 F.3d at 211. The most that the Amended Complaint musters is the largely conclusory allegation that "[m]embers of the Sumitomo Group act in concert through the Sumitomo Group Public Affairs Committee, which engages in public relations activities to enhance public trust in the members of the Sumitomo Group, including publication of a quarterly newsletter." Am. Compl. ¶ 40. Zappia fails to explain how sharing a quarterly newsletter for joint promotion means that companies are operationally integrated. If that were enough, any trade newsletter in which competitors jointly promote their common industry would create operational integration. The Amended Complaint's additional broad and vague

statement that members of a *keiretsu* are connected by "informal business relations" does not render the inference of operational integration any more plausible. Id. ¶ 39.

The Amended Complaint nevertheless alleges that because of Skadden's representation of other Sumitomo Group entities, Skadden (whose duty was to give legal advice) was somehow less motivated to encourage the special committee (which consisted of experienced businesspersons assisted by an outside financial advisor, Goldman Sachs) to seek the highest price per share that Sumitovant would pay or to solicit other potential acquirers. Id. ¶¶ 70-75. But the specific facts that the Amended Complaint elsewhere pleads belie this allegation, even taking the facts in the light most favorable to Zappia. The Amended Complaint details how the special committee, advised by Skadden along the way, engaged in a series of negotiations that pushed up Sumitovant's bid from an initial offer of $22.75 per share (that the special committee, advised by Skadden, publicly rejected out of hand), to $25.25 per share, to $26.25 per share, to $26.75 per share, and ultimately to Sumitovant's "best and final" offer of $27 per share. Id. ¶¶ 84-100. Moreover, even after a Sumitovant representative communicated "that $27.00 per share was the best and final price [it] was able to offer," the special committee, advised by Skadden, made a counteroffer of $28.50 per share. Id. ¶¶ 100-01. It was only after

- 10 -

the Sumitovant representative reiterated "that $27.00 per share was Sumitovant's and Sumitomo Pharma's best and final offer, and that the transaction would not move forward if the Special Committee required a higher price than $27.00 per share," id. ¶ 102, and after Myovant's financial advisor, Goldman Sachs (who the Amended Complaint makes no allegation was anything but impartial), "delivered its Fairness Opinion to the Special Committee concluding that the $27.00 per share in cash that would be paid to the holders of Myovant common shares (other than Sumitovant and its affiliates) pursuant to the Merger was fair from a financial point of view," id. ¶ 107, that the special committee recommended accepting Sumitovant's offer, id. ¶ 109. The Amended Complaint's own narrative of the special committee's negotiations thus throws cold water on the assertion that Skadden somehow thwarted efforts for Myovant to receive the highest price it could.

The Amended Complaint also pleads facts that make implausible the suggestion that any conduct by Skadden is why the special committee did not solicit bids from other potential acquirers. The Amended Complaint directly quotes the proxy statement's conclusion that the special committee considered "the risk that Sumitovant" -- which already held more than 50% of Myovant's public shares -- "would be unwilling to support a sale of Myovant to a third party[,] which could make any outreach futile, the likelihood that

- 11 -

few parties other than one of Myovant's current commercial partners
would be interested in a transaction and the potential negative
impact on Myovant and its relationships with third parties if such
outreach were to become known, . . . and the expectation that any
merger agreement that might ultimately be entered into with
Sumitovant would be expected to allow the Special Committee to
consider unsolicited inbound acquisition proposals that might be
made." Id. ¶ 70. Although the Amended Complaint dismisses this
explanation as speculative, it is in fact the Amended Complaint
that is merely speculating about Skadden's motives and actions
rather than making a plausible allegation based on information and
belief. And to the extent the Amended Complaint alleges misconduct
or breach of fiduciary duty by Myovant's board or the special
committee, see, e.g., id. ¶¶ 71-72, a suit under Section 14(a) and
Rule 14a-9 is not the appropriate vehicle to address such a breach.
See Koppel, 167 F.3d at 133 ("[N]o general cause of action lies
under § 14(a) to remedy a simple breach of fiduciary duty.").[5]

---

[5] In their motion to dismiss, defendants also discuss matters
external to the Amended Complaint, such as earlier lawsuits that
Zappia brought and dismissed, which alleged deficiencies with the
proxy statement or potential breaches of duty. Defendants thus
argue that this is an opportunistic, "lawyer-driven lawsuit." Mem.
at 1-2. That rhetoric relies on materials not proper for the
Court's consideration in assessing a motion to dismiss and on
matters, such as speculation about a plaintiff's motivation for

Zappia relies on Wilson v. Great American Industries, Inc., 855 F.2d 987 (2d Cir. 1988), to argue that "[t]he relevant inquiry is not whether an actual conflict of interest existed, but rather whether full disclosure of potential conflicts of interest has been made." Id. at 994. In Wilson, the Second Circuit referred to providing shareholders an "opportunity to judge for themselves what significance to attribute to" a potential conflict of interest. Id. Read outside the context of the facts of that case, that broad statement might arguably lend some support to Zappia's view that the proxy statement's reference to Skadden's "absence of conflicts" was materially misleading. But Zappia "read[s] too much into too little." Nat'l Pork Producers Council v. Ross, 598 U.S. 356, 373 (2023). "The language of an opinion is not always to be parsed as though we were dealing with language of a statute." Id. "Instead, . . . opinions dispose of discrete cases and controversies and they must be read with a careful eye to context." Id.

The context of Wilson was an alleged entanglement between officers and directors of the two companies involved in a merger. Wilson, 855 F.2d at 989. In particular, David Dyer, a director of

_____

bringing suit, that are irrelevant to the question whether the Amended Complaint states a claim under Rule 14a-9.

- 13 -

the target company in that case, Chenango, as well as being
Chenango's General Counsel, had also for years represented several
of the significant directors, the Koffmans, of the acquiring
company. Id. at 990. The plaintiffs alleged, and the Second Circuit
held, that the proxy statement was materially misleading because
it failed to disclose that representation even though it portrayed
Dyer as loyal to Chenango. Id. at 991, 994. The Second Circuit
explained that "[t]he description of Dyer's law firm in the proxy
statement as 'having represented Chenango in connection with the
Merger' necessarily implied that Dyer and his firm were acting
with complete loyalty to Chenango and its shareholders and without
conflicting interests that might, or might be perceived to, affect
their judgment and advocacy on Chenango's behalf." Id. at 994.
"Considering his status as the shareholders' counsel and as a
director recommending the merger, Dyer's long-standing business
relationship with the Koffmans should have been disclosed." Id.

The facts here are far removed from those circumstances.
Zappia does not allege any potential conflict of interest stemming
from a relationship between directors of Sumitovant and Myovant,
the two companies that merged. Nor does the Amended Complaint
allege that Skadden -- which served as counsel for the Myovant
special committee but was not itself negotiating terms with
Sumitovant or responsible for approving the deal -- had a

- 14 -

relationship with Sumitovant. Instead, the Amended Complaint
refers to Skadden's professional relationship with other companies
in the Sumitomo Group that shared a quarterly newsletter with
Sumitovant, including companies that held an ownership interest of
a few percent in Sumitomo Chemical, which in turn was a majority
owner of Sumitovant's corporate grandparent. Given the markedly
distinct facts in Wilson, there is no suggestion that the Second
Circuit contemplated Skadden's much more attenuated relationship
to be the kind of "potential conflict[] of interest" that must be
disclosed to shareholders. Id.

Independent of all this, even if the Court were to accept as
true the assertion that Skadden in some sense had a conflict of
interest, a reasonable investor would not have found the proxy
statement to be materially misleading in light of other public
information. The Amended Complaint nowhere alleges that Skadden's
representation of other Sumitomo Group entities was kept secret or
was unknown to the public at the time of the proxy statement.
Indeed, Zappia was himself aware of that information -- and was
able to allege it in the Amended Complaint -- precisely because it
was reasonably available to the public. See In re Merrill Lynch &
Co., Inc. Rsch. Reps. Sec. Litig., 272 F. Supp. 2d 243, 250
(S.D.N.Y. 2003) ("Plaintiff's own Complaint demonstrates that
information concerning companies in which the Fund might invest

- 15 -

. . . was publicly available. . . . Plaintiff therefore cannot show that such information was concealed from the markets or from Fund investors."). Omitted information in a proxy statement is only material to a reasonable investor if it "significantly alter[s] the total mix of information made available." Koppel, 167 F.3d at 131. Because "the total mix of information" included the very representations by Skadden that the Amended Complaint discusses, the statement that Skadden had an "absence of conflicts" could not have significantly altered a reasonable investor's impression. Id.; Am. Compl. ¶ 9.

Finally, the Amended Complaint fails to pass muster for another independent reason: It fails to adequately allege plausible facts supporting the claim of negligence. Although a claim under Rule 14a-9 does not require scienter, the parties agree it is not a strict liability provision either. See Wilson, 855 F.2d at 995. Yet the Amended Complaint's sole allegation pertaining to negligence is the conclusory statement that "[d]efendants were at least negligent in filing the Proxy with these material misrepresentations and omissions." Am. Compl. ¶ 145. That threadbare recital of an essential element of a Rule 14a-9 claim does not suffice. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

At oral argument, Zappia's counsel articulated a roundabout way the Court could infer defendants' negligence. The proxy

- 16 -

statement at issue (which all agree is incorporated by reference
into the Amended Complaint) explains that in an April 2022 meeting,
the special committee determined that the Cooley law firm -- which
had represented the special committee prior to Skadden -- was not
"disqualified from being engaged . . . by virtue of any potential
conflicts of interest." ECF No. 25-3 ("Proxy"), at 25-26. By
contrast, the proxy statement does not expressly state that the
special committee ever inquired into whether Skadden had a conflict
of interest in the representation. Instead, it stated that in a
June 2022 meeting, "the Special Committee determined to retain
Skadden to serve as counsel . . . based on, among other things,
Skadden's qualifications, experience and reputation and the
absence of conflicts on the part of Skadden." Id. at 26 (emphasis
added). Zappia asks the Court to infer, from the minute differences
between the description of Cooley and the description of Skadden,
that the special committee failed to make any efforts to vet
Skadden's independence. See 12/12/2023 Transcript of Mot. to
Dismiss Arg. ("Transcript").

Zappia's suggested inference is implausible. "A claim has
facial plausibility when the plaintiff pleads factual content that
allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." Ashcroft v. Iqbal,
556 U.S. 662, 678 (2009) (emphasis added). While "[t]he

- 17 -

plausibility standard is not akin to a probability requirement,
. . . it asks for more than a sheer possibility that a defendant
has acted unlawfully." Id. "Where a complaint pleads facts that
are merely consistent with a defendant's liability, it stops short
of the line between possibility and plausibility of entitlement to
relief." Id. "Determining whether a complaint states a plausible
claim for relief" is "a context-specific task that requires the
reviewing court to draw on its judicial experience and common
sense." Id. at 679. Applying "judicial experience and common sense"
to Zappia's attenuated chain of reasoning regarding the special
committee's alleged conduct, the Amended Complaint fails to show
anything more than a remote, theoretical possibility that the
special committee acted negligently rather than accidentally or
reasonably. Id. Because theoretical possibility is far from
plausibility, the Court finds that the Amended Complaint fails to
adequately allege negligence.

IV.   Conclusion

Because the Amended Complaint fails to plausibly allege a
violation of Rule 14a-9, the Court grants defendants' motion to
dismiss. At oral argument, plaintiffs' counsel, confronted with
all the arguments considered here, could not identify a single
additional fact that any Second Amended Complaint would allege
beyond what has already been pleaded. See Transcript. Accordingly,

the dismissal is with prejudice. The Clerk is respectfully directed
to close documents 23 and 27 on the docket, enter final judgment,
and close this case.[6]

    SO ORDERED.

New York, NY
December 28, 2023

JED S. RAKOFF, U.S.D.J.

---

[6] While briefing on the motion to dismiss was underway, Zappia and
another potential plaintiff, Baruch Halberstam, moved to appoint
Halberstam as Co-Lead Plaintiff. <u>See</u> ECF No. 27. The Court's
dismissal of the Amended Complaint and entry of final judgment
render that motion moot.